149 So.2d 898 (1963)
Wilma WILLIAMS, a widow, Appellant,
v.
CATERPILLAR TRACTOR CO., Inc., Appellee.
No. 2890.
District Court of Appeal of Florida. Second District.
February 1, 1963.
Rehearing Denied February 25, 1963.
*899 Charles E. Davis, Fishback, Williams, Davis & Dominick, Orlando, for appellant.
Monroe E. McDonald, Sanders, McEwan, Schwarz & Mims, Orlando, for appellee.
ALLEN, Judge.
This is a products liability case brought by plaintiff-appellant in a wrongful death action on a theory of negligence. The cause was originally instituted against the manufacturer, defendant below and appellee here, and the retailer, Joseph L. Rozier Machinery Co. Summary judgment was entered in favor of the retailer, Rozier, and affirmed on appeal to this court in an opinion written by Judge White. Williams v. Joseph L. Rozier Machinery Co., Fla.App. 1961, 135 So.2d 763. Whereupon the cause proceeded on the fourth amended complaint and answer thereto against appellee manufacturer. Upon consideration of the voluminous pleadings, admissions, answers to interrogatories, exhibits and depositions on file, the lower court determined that there was no genuine issue as to any material fact and entered summary final judgment in favor of defendant-manufacturer. On appeal, plaintiff assigns this ruling as error.
The plaintiff is the surviving wife of Kenneth Williams who was killed on July 2, 1959, in the course of his employment as a mechanic working on a caterpillar tractor owned by his employer, C.A. Meyers Construction Company. The ostensible cause of Williams' death was the excessive release of pressure from a hydraulic tread adjuster which exploded a grease fitting into his face. Williams' employer had purchased the tractor from the distributor, Rozier, who in turn had purchased it from appellee.
Plaintiff's theory of negligence is predicated on the allegation that the manufacturer was negligent in failing to provide adequate warning for an alleged inherently dangerous mechanism, to wit: the aforesaid hydraulic tread adjuster, and the further allegation that a pressure relief valve attached to said mechanism was negligently designed and/or manufactured so as to render it incapable of functioning as intended.
No one actually saw Williams working on the mechanism when the explosion of the fitting which caused his death occurred. However, just prior to the explosion, he was on the left side of the tractor with a crescent wrench in his hand, ostensibly preparing to relieve the pressure in the left hand tread adjuster cylinder. This, coupled with other circumstances surrounding the accident, leads to the inference that he was performing or was about to perform some work on the mechanism when pressure was released causing the explosion that killed him.
From among the sixteen depositions on file, the following facts pertinent to just how the hydraulic track adjustment mechanism works, or is supposed to work, have been distilled. The machine involved in this case is a D-8 Caterpillar tractor, commonly called a bulldozer, and hereinafter referred to as the tractor.
On each side of the tractor at the rear is a large sprocket wheel which rotates in the same direction of travel, forward or backward, in which the tractor at any given time may happen to be moving. The sprockets are driven by the internal drive mechanism of the tractor. In other words, they are the two and only "wheels" which propel the tractor. An endless belt of flat metal links, connected to each other by pins and bushings to provide flexibility, comprises *900 the track or tread on which the tractor actually rides. This belt is wrapped around and propelled by the sprocket. Going forward from the sprocket, the tread rides over two rollers at the top and under six rollers at the bottom. The weight of the tractor is supported entirely by the latter six rollers. At the front of the tractor, again on either side, the tread wraps around an idler wheel so-called presumably because it does not propel or carry any of the tractor's weight. The tractor being driven, the idler wheel rotates in the same direction that the tractor travels.
Through normal usage, the treads become internally worn and hence slack. To keep them from falling off it is necessary to increase track tension. This is accomplished by moving the front idler wheel further forward which serves to take up the slack in the tread. Activating the idler wheel forward is a hydraulic track adjustment mechanism comprised, among other things, of a cylinder and piston. The forward part of the cylinder is attached by various intervening parts to the idler wheel. The front of the piston is in the cylinder. The rear of the piston is inserted in a recoil spring housing and presumably butts against the recoil spring. If, during operation, debris gets tangled in the track, the recoil spring operates to slacken the track temporarily and free it of the foreign matter.
Unlike the normal piston-cylinder arrangement, on the hydraulic mechanism here involved, the piston normally remains stationary and the cylinder rides backwards and forwards over it when loosening or tightening the track as the case may be.
To move the idler wheel forward and hence tighten the track, grease under pressure is pumped into the space within the cylinder between the front of the cylinder itself and the front of the piston. As grease is pumped into this space, the cylinder rides forward over the piston, exposing more of the piston to the rear.
Eventually, as the track becomes more and more worn, the cylinder becomes fully extended and further tightening cannot be accomplished hydraulically. Continued pumping of grease into the cylinder can only serve to compress the recoil spring at the rear of the piston by forcing the piston backwards against it. This is the only instance, presumably, when the piston would not be stationary. Such continued pumping of grease into the cylinder after the mechanism has been fully extended mechanically also increases the pressure in the cylinder. When the cylinder is fully extended, it appears that the pressure therein approximates 4000 pounds per square inch. To completely compress the recoil spring would take pressure in the cylinder in the amount of about 5650 pounds per square inch.
The grease is pumped into the cylinder on each side of the tractor through a grease fitting which is inside an access door located about half way from the front of the tractor to the back and in the center of the space between the top and bottom portions of the track. Attached to the cylinder near the fitting is a pressure relief valve. This valve purportedly releases grease when opened, thus releasing pressure in the cylinder and causing it to pull backwards from the idler wheel. This process is employed when it is desired to relieve track tension. Supposedly, the idler wheel can be moved to the rear so as to reduce track tension simply by relieving the pressure in the cylinder. Frequently, however, manual pressure is applied to the idler wheel to force it to the rear. Also, during a normal loosening of the track operation, one individual drives the tractor backwards and forwards at the same time another individual releases grease pressure from the relief valve. These simultaneous procedures operate to hasten the escape of grease from the cylinder and hence the rearward movement of the idler wheel.
The access door, inside of which is found the grease fitting and the pressure relief *901 valve, is more accurately described as a metal lid which lifts open in an upward and backward motion when looking at it from the side of the tractor. On the under side of this lid and intended to be read when the lid is open is affixed a metal sign approximately 2 x 4 inches in size which reads:
"WARNING: High pressure cylinder. Do not open vent valve more than 1/2 turn or remove fitting until pressure is relieved."
The sign implies that there are circumstances under which the fitting should be removed. Actually, if all parts are functioning properly, it is never necessary to remove the fitting, for the pressure relief valve is supposed to be capable of venting all of the grease in the cylinder. The only time the fitting is removed as far as design intent goes is when it becomes stopped up or otherwise ineffective to admit grease into the cylinder. Normal operation of the track adjustment mechanism, either in a loosening or a tightening of the track does not contemplate a removal of the fitting insofar as the mechanism's design is concerned.
There can be instances when pressure is relieved through the relief valve to achieve proper track tension. Varying soil conditions require varying amounts of pressure to maintain such tension. Thus, operating the tractor under certain soil conditions can cause the track to become too tight which requires a release of pressure from the cylinder. Also, when tightening, it is possible to pump too much grease into the cylinder causing the track to become too tight. In such an instance, grease would likewise be vented through the relief valve to achieve the correct track tension.
Another reason for venting grease through the relief valve arises when it becomes necessary to remove the track altogether from around the sprocket, rollers and idler wheel. Such was the operation in progress when Williams was killed.
At the time, the tractor had been in operation for about two months since its purchase, new, by Williams' employer. Even though the tractor was relatively new, the cylinder in the track adjuster had become fully extended due to the condition of the soil in which the tractor had been operating. Such soil condition had caused excessive wear internally on the pins and bushings connecting the flat metal links which make up the track. This in turn had caused the track to become slack to the extent that the hydraulic adjuster could no longer put tension on it, the cylinder which pushes the idler wheel forward having become fully extended. Thus, the track had to be taken off and the link-connecting pins and bushings removed, turned and put back in place.
The tractor was ordered into Williams' employer's maintenance shop on July 2, 1959, the day Williams was killed, so that the track removal operation could be performed over the July 4th weekend when the tractor would be out of service anyway. Williams, a jack-of-all-trades type mechanic, had been hired some four months before the accident by his employer's maintenance shop foreman, one Jack Wickham. Williams was expected to perform as a general maintenance man but not as an experienced bulldozer mechanic. He had not worked on this particular tractor before July 2, 1959, but had worked on two other caterpillar tractors, a D-7 and a D-6, during the four months prior. There is testimony that Williams had once removed a grease fitting from the D-6, but the record is ambiguous as to whether said D-6 was equipped with a hydraulic tread adjuster or a mechanical screw type adjuster instead.
Foreman Wickham, Williams and two other employees, Sackett and Slemmons, were preparing to commence the track removal operation. Williams approached the track on the left side of the tractor with a crescent wrench in his hand. It was his apparent intent to do whatever was necessary to slacken the track enough for removal. *902 Though close by, neither Wickham, Sackett nor Slemmons actually witnessed what Williams did or did not do. Their attention was called to Williams after they heard a "loud pop" presumably caused by the explosion of the grease fitting. Turning toward the sound, they saw Williams lying down with blood on his face.
It is not known whether or not Williams attempted to release the pressure by use of the pressure relief valve before attempting to remove the grease fitting or, for that matter, whether or not he even attempted to remove the fitting. There was testimony that the next day the pressure relief value was found open.
As aforesaid, it was not contemplated by the manufacturer that the grease fitting should be removed in order to vent grease from the cylinder. However, Foreman Wickham testified that on other tractors he had worked on, the relief valves either didn't work properly or didn't relieve enough pressure. Therefore, it was his procedure when relieving pressure from this type of cylinder to ignore the relief valve out to stand clear and knock the grease fitting off. Wickham had never given Williams any instructions as to how to relieve pressure in this type cylinder, but there is testimony that the latter had been permitted to observe the former's method of relieving pressure, to-wit: by knocking the fitting off and standing clear while doing so.
As noted, the warning sign implies that pressure will be relieved from the cylinder when the relief valve is turned 1/2 turn. There is, however, no gauge or similar device to check the extent of pressure relief. The only ways to note the release of pressure are to observe grease emitting from the relief valve and any slackening which may occur in the track. The testimony was in conflict as to whether release of pressure alone would cause the track to slacken.
Testimony was also in conflict as to whether the type of valve involved would release any grease and hence pressure at 1/2 turn. There is also contradicted testimony that the valve which was standard equipment on the cylinder at the time of the accident was a later modification of a previous valve to which the "1/2 turn" sign actually had application. From said testimony, the inference can be drawn that possibly the later valve required more than 1/2 turn to achieve the release of pressure. There are many other conflicts in the testimony elicited by deposition, among which are conflicting statements of expert witnesses as to whether or not there was in so many words a defect in the design and manufacture of the relief valve.
Plaintiff alleged on information and belief that Williams attempted to relieve the pressure by opening the valve and was deceived into believing that the pressure had been relieved, and that he then attempted to remove the grease fitting which caused his death. Plaintiff also alleged that the warning sign was so located that it got covered with dirt and grease so at not to be visible; that no other warning was on the tractor; and that consequently the decedent did not know of the danger in the mechanism, did not release the pressure in the cylinder and was killed because he was not adequately warned of said danger. Plaintiff further alleged that the warning sign was so placed, worded and designed that it would be inadequate to advise the decedent of the dangers which defendant was apprised of. These allegations were denied by the answer. The depositions and exhibits on file do not persuade that the factual issues thus framed have been resolved so as to free the defendant of liability as a matter of law.
There was testimony that agents of the retailer (Rozier) had informed the decedent's employer through its servants as to the proper method of releasing pressure from the cylinder but that this procedure was not always followed. As noted previously, Foreman Wickham, for whatever his reasons, chose to ignore the recommended procedure. His failure to instruct *903 Williams as to how to properly relieve the pressure in the cylinder, assuming such were possible, coupled with his own oft-demonstrated unsafe method of relieving pressure on other tractors bears on the question of intervening negligence on the part of the employer and its servants and is addressed to the element of proximate causation, an issue determinable only by a jury.
By virtue of the difficulty in unearthing the factual background of this case, the technical nature of the subject matter, and the apparent unresolved factual issues pervading the record, this court is compelled to the conclusion that the entry of judgment for the defendant manufacturer in this case was premature.
An apparent question of fact remaining unresolved by the depositions is whether or not the warning sign was adequate to warn of the potential danger inherent in the mechanism. See Tampa Drug Co. v. Wait, Fla. 1958, 103 So.2d 603, 75 A.L.R.2d 765. In other words, was the degree of warning commensurately proportionate to the potential danger of which the manufacturer was aware, or, in the exercise of reasonable care, should have been aware? The degree of adequacy of the warning would likewise have a direct bearing on the issue of the contributory negligence of Williams, which is one of the defenses raised by the answer in the instant case. Williams could not be charged with a duty to guard against the possibility of an exploding grease fitting unless the circumstances required him to expect such a danger. Matthews v. Lawnlite Company, Fla. 1956, 88 So.2d 299.
Also, in reference to the warning sign, an issue has been made and has not been resolved as to whether or not said sign was in such a position on the apparatus so as to be rendered obscure in the normal use of the tractor.
Irrespective of the sufficiency of the warning, the depositions and other documents on file do not clearly determine whether or not the pressure relief valve was defectively designed and/or manufactured, and if so, whether or not such defect was attributable to the want of due care of the manufacturer.
The doctrine of "product liability" of a manufacturer to persons not in privity with him, for injuries caused by a defect in the manufactured product attributable to the negligence of the manufacturer, is followed by the courts of this state. Matthews v. Lawnlite, supra; Rawls v. Ziegler, Fla. 1958, 107 So.2d 601; A.E. Finley & Associates, Inc. v. Medley, Fla.App. 1962, 141 So.2d 613. Compare Carter v. Hector Supply Co., Fla. 1961, 128 So.2d 390; McBurnette v. Playground Equipment Co., Fla. 1962, 137 So.2d 563.
Lastly, as noted supra, the issue of whether or not the failure, if any, on the part of the defendant to exercise due care, either in connection with the design and manufacture of the relief valve or the giving of proper warning or both, was the proximate cause of Williams' death is a material one which was not laid to rest by the depositions which were before the lower court. Also alive as relates to proximate causation are issues involving the contributory negligence vel non of Williams and intervening negligence vel non on the part of the employer and its servants.
From a reading of the lower court's opinion written in support of the summary judgment here appealed, it appears that the trial judge was of the view that upon the trial of this cause before a jury the plaintiff would be unable to establish a prima facie case. This conclusion is reached from a reading of the last paragraph of the lower court's opinion which states:
"After careful study of the depositions, the Court has reached the conclusion that there is no evidence which can support either claim asserted in the complaint and that there is no genuine issue of material fact, hence the Defendant's *904 motion for summary judgment must be granted."
In ruling on a motion for summary judgment a trial judge is better advised not to attempt, on the basis of a study of discovery depositions, to resolve the question of the sufficiency of evidence not yet adduced. The question properly determined on motion for summary judgment is whether or not there exist in the cause genuine issues of material fact. While the court may be convinced that a plaintiff will have insurmountable difficulties in proving his case, it should not by summary judgment prevent him from attempting to do so when, as in this case, so many questions of fact appear, on the strength of the record, to remain controverted. Whether or not the plaintiff's allegations and the statements made in discovery depositions in support thereof can be proved at trial is a matter beyond the scope of summary judgment proceedings. See Nance v. Ball, Fla.App. 1961, 134 So.2d 35.
In respect to appellant's point two, it appears that she has been afforded complete and adequate discovery as to all material issues involved in this cause and that the lower court did not abuse its discretion by limiting discovery in the manner complained of. Appellant contends that the lower court erred by denying one of her motions to compel discovery concerning other accidents known to the defendant involving the track adjustment mechanism. However, the record discloses that such discovery as was permitted covered the subject of defendant's knowledge of other accidents.
Moreover, the record in its present state being replete with the fruits of the various pre-trial maneuvers, it would appear that on the remand of this cause, the best interests of the litigants would be served by bringing it to trial
Reversed and remanded.
SHANNON, C.J., and WHITE, J., concur.