537 P.2d 682

**FIRST NATIONAL BANK IN ALBUQUERQUE, as guardian for and on behalf of Dorothy Jean Huckleby, Charles Amos Huckleby, Ernestine Huckleby and Michael Huckleby, minors, Lois Huckleby, and Ernest Huckleby, Plaintiffs-Appellants,**

New Mexico Mill & Elevator Co., a corporation, and Ray Pritchett, each individually and d/b/a Golden West Seed Co., Defendants-Appellants,

**v.**

**NOR–AM AGRICULTURAL PRODUCTS, INC., a corporation, Morton International, Inc., a corporation, and Morton Salt Co., a corporation, Defendants-Appellees.**

No. 1375.

Court of Appeals of New Mexico.

April 30, 1975.

Certiorari Denied May 28, 1975.

------◆------

Richard E. Ransom, William G. Gilstrap, Smith, Ransom & Gilstrap, Albuquerque, Albert J. Rivera, Alamogordo, for plaintiffs-appellants.

William K. Stratvert, Keleher & McLeod, Albuquerque, Garrett & Hartley, Clovis, for defendants-appellants.

Jackson G. Akin, Bruce D. Hall, Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, for defendants-appellees.

## OPINION

SUTIN, Judge.

This is an appeal from summary judgment granted in favor of defendants Morton International, Inc. and Nor-Am Agricultural Products, Inc. on plaintiffs' complaint and on the cross-claim of the co-defendant New Mexico Mill & Elevator Co., d/b/a Golden West Seed Co.

We reverse.

### A. *Parties*

Morton International and Morton Salt Co. are the same entity. Nor-Am is a subsidiary of Morton International and is the national distributor of "Panogen-15", the product manufactured by Morton. These three defendants will be referred to as "Morton".

New Mexico Mill & Elevator Co., d/b/a Golden West Seed Co., is the grain company which received Panogen-15 from Morton. Golden West used Panogen-15 in treating grain for seed purposes. It will be referred to as "Golden West".

Ernest and Lois Huckleby are the father and mother of Dorothy Jean, Charles Amos, Ernestine and Michael Huckleby. They will be referred to as "Huckleby".

Both Huckleby and Golden West now appeal the summary judgment in favor of Morton.

On this appeal, Golden West has adopted all issues and theories raised by Huckleby, as well as all of Huckleby's arguments in support.

### B. *Huckleby's Theories for Recovery*

Huckleby's complaint sets forth five theories for recovery. With regard to three of those theories, we agree with the trial court that there is no genuine issue as to any material fact, and that Morton, therefore, is entitled to judgment as a matter of law.

The first theory on which we affirm is: The labelling on Morton's product, and the warnings contained therein, violated the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C.A. § 135 et seq. (1964), as amended, (1975 Supp.); and that such violation constituted negligence per se.

■ We find nothing in the record to suggest violation of the federal statute. On the contrary, the record contains evidence that the labelling information in question had been registered with and approved by the Department of Agriculture, in compliance with the statute.

The second theory on which we affirm is: Morton was negligent in the formulation, testing and investigation of its product.

■ The product in question is Panogen-15. Huckleby does not contend that Morton negligently manufactured Panogen-15. Huckleby contends that Morton *should not have manufactured it at all.* In reality, this is a nuisance theory, and not a theory of negligence in manufacture. This theory fails for two reasons. First, Panogen-15 was manufactured pursuant to authority granted by the federal government. Therefore, its manufacture does not constitute a nuisance, as a matter of law. Section 40A–8–1, N.M.S.A.1953 (2d Repl.Vol.

6). Second, our Supreme Court has expressed its unwillingness to allow a personal injury claim to go to trial on a nuisance theory. Jellison v. Gleason, 77 N.M. 445, 423 P.2d 876 (1967).

The third theory on which we affirm is: Morton is absolutely liable for injuries caused by the marketing of an ultrahazardous product.

New Mexico has adopted the rule of absolute liability for ultrahazardous activities given by Restatement, Torts §§ 519, 520, (1938) at 41–47. Thigpen v. Skousen & Hise, 64 N.M. 290, 327 P.2d 802 (1958). Huckleby contends that Panogen grain treatment is an ultrahazardous activity, as defined in the Restatement rule. We disagree. That rule defines an ultrahazardous activity as one (a) that is not a matter of common usage; and (b) in which the danger cannot be eliminated by the exercise of utmost care. Restatement, Torts § 520. The record shows that neither of those conditions are met in the instant case. First, Panogen grain treatment had wide acceptance and use throughout the country at the time of the Huckleby incident. Second, the arguments of all parties recognize that adequate warning would eliminate the danger.

We reverse, and hold that Huckleby and Golden West can go to trial on their complaint and cross-claim on the following two theories for recovery:

(1) Negligence as to the warning, provided by the seller, of dangers associated with use of the seller's product;

(2) Special liability of the seller of a product for physical harm to a user or consumer, pursuant to Restatement, Torts, 2d § 402A, v. 2 (1965), at 347–348.

Golden West may proceed against Morton only on its claim for contribution. See this opinion, *infra.*

C. *Facts*

In the summer of 1969, Ernest Huckleby and a number of his friends in Alamogordo, New Mexico, were raising hogs as a sideline. On August 16, 1969, Huckleby and three friends went to Golden West to buy some grain to feed their hogs. They all bought grain, and in the course of so doing, one friend asked an employee of the company if they could get some of the older, worse-looking grain, that was standing around in sacks towards the rear of the area, for a cheaper price. The employee allowed them to take that grain free of charge.

It appears that mixed in with that poor quality feed grain was grain that had been treated with Panogen-15. Panogen-15 is a liquid treatment for grain that is to be used as seed. The treatment prevents fungus and other seed diseases.

Morton knew the method of processing grain into seed suitable for planting. It knew that "the first step in the treatment of [grain] for planting is the separation of good [grain] from chaff, sticks, dirt, weed seeds, broken seeds, shrivelled seeds and other materials not suited for planting * * *. After cleaning, the good [grain] is routed to the [grain] treater where the Panogen-15 treatement is applied; the treated [grain] is then bagged. In the course of treating and bagging good [grain] a residue of [grain] may collect underneath the treater or in the bagging area. This treated residue is commonly called 'sweepings'."

During the period of the events that gave rise to this case, Panogen-treated grain was widely used for planting throughout the country. Morton sold about 174,000 gallons of liquid Panogen-15 each year. Panogen-15 contains mercury, which makes it very highly toxic. Eight parts of Panogen-treated grain per million parts of untreated grain, by weight, is a lethal dose. Following the Huckleby incident, the government suspended Morton's license to market Panogen-15.

Huckleby fed his hogs from the grain that had been obtained from Golden West, mixing the grain with garbage. He fattened a boar hog on this diet for seven

weeks. On October 4, 1969, he slaughtered the boar hog. For the next two or three months, the family ate meat and internal organs from the slaughtered hog with regularity. In late October, Huckleby's hogs that had been fed from the treated grain became ill. On December 4th, Ernestine became ill; in late December, Charles Amos became ill; and in January, 1970, Dorothy Jean became ill. On March 22, 1970, Mrs. Huckleby gave birth to Michael, who was born with congenital defects.

Medical authorities determined that the children had been stricken by organic mercury poisoning, attributable to their eating meat from the boar hog that had been fed on Panogen-treated grain. As the result, the children all suffered permanent blindness, paralysis and other effects resulting from injuries to the central nervous system.

The only warning information given to Golden West by Morton were labels and tags relative to Panogen-15. Copies of the label and tag are appended to this opinion.

Extensive investigation by experts from the Federal Communicable Disease Center, in Atlanta, Georgia, established the following facts:

Organic mercury poisoning selectively strikes children, which explains why the adult members of the Huckleby family were not stricken. The poisoning of the Huckleby children resulted from a chain or secondary poisoning effect of the Panogen-15. That is, the boar hog which fed on Panogen-treated grain did not, itself, show signs of mercury poisoning at the time it was slaughtered. However, the mercury that the hog had taken in from the treated grain caused organic mercury poisoning in the children who ate meat and internal organs from that hog.

D. *Morton's Admissions*

For purposes of its motion for summary judgment, Morton admits:

(1) The injuries to the Huckleby children;

(2) That the injuries were caused by mercury poisoning traced to the Panogen-treated grain.

(3) That only the Panogen tag and label should be considered to determine what warning information was communicated by Morton to Golden West.

(4) No warning information of any kind was communicated to Ernest Huckleby. He did not receive any tags or labels with the grain he acquired from Golden West. Nor was he otherwise warned of dangers associated with treated grain.

(5) Morton knew about the chain poisoning effect that caused the Huckleby children's injuries.

(6) Misuse of Panogen-treated grain for animal feed was foreseeable by Morton.

(7) Morton had a duty to warn of dangers from any foreseeable misuse of Panogen-treated grain.

E. *The Law on Summary Judgment*

New Mexico uses the following rules for determining whether an issue of fact exists in a summary judgment proceeding.

(1) A summary judgment proceeding is not to decide an issue of fact, but, rather, to determine whether one exists.

(2) Summary judgment can be granted only where the record shows there is no genuine issue as to any material fact.

(3) The party opposing the motion for summary judgment must be given the benefit of all reasonable doubts in determining whether an issue of fact exists.

(4) Summary judgment can be granted only where the moving party is entitled to the judgment as a matter of law, upon clear and undisputed facts.

(5) Summary judgment proceedings must not be used as a substitute for trial.

See, § 21-1-1(56)(c), N.M.S.A.1953 (Repl.Vol. 4); Summers v. American Reliable Insurance Company, 85 N.M. 224, 511 P.2d 550 (1973); Goodman v. Brock, 83 N.M. 789, 498 P.2d 676 (1972); Southern Pacific Company v. Timberlake, 81 N.M.

.250, 466 P.2d 96 (1970); Spears v. Canon de Carnue Land Grant, 80 N.M. 766, 461 P.2d 415 (1969); Shumate v. Hillis, 80 N. M. 308, 454 P.2d 965 (1969); Great Western Contruction Co. v. N. C. Ribble Co., 77 N.M. 725, 427 P.2d 246 (1967); Institute for Essential Housing, Inc. v. Keith, 76 N.M. 492, 416 P.2d 157 (1966).

F. *Morton had a duty to warn on negligence theory of dangers associated with use of Panogen-15.*

Morton admits that it had a duty to warn of dangers from the foreseeable misuse of Panogen-treated grain for feed. However, Morton contends that it had no duty to warn Huckleby as a matter of law because it had a *right to rely* on Golden West to use ordinary care to prevent misuse of treated grain.

■ Whether a duty exists is a pure question of law for the court. Southern Union Gas Co. v. Briner Rust Proofing Co., 65 N.M. 32, 331 P.2d 531 (1958).

In support of its "right to rely" theory, Morton contends:

(1) The courts have recognized the inability of the supplier to police the processor.

(2) The acts or omissions of Golden West, the processor, were an independent (efficient) intervening cause.

(3) Golden West had actual knowledge of the hazards associated with the misuse of Panogen-treated grain for feed.

(4) Constructive knowledge of the hazards from using Panogen-treated grain for feed can be imputed to Golden West, because Morton's tag and label gave adequate warning as a matter of law.

None of these arguments sustains Morton's contention that it had no duty to warn Huckleby as a matter of law.

(1) *Morton's inability to police Golden West is not supported in law.*

Morton relies on several cases to support its position that its inability to police Golden West's operations relieves Morton of the duty to warn Huckleby. However, every case on which Morton relies is distinguishable, for one of the three following reasons:

(a) The court held that the incident causing plaintiff's injuries was unforeseeable. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5th Cir. 1967); Stief v. J. A. Sexauer Manufacturing Co., 380 F.2d 453 (2nd Cir. 1967).

(b) An essential fact in plaintiff's case was that the manufacturer had a duty to supervise the middleman's operations. *Stief,* supra (Friendly, J., concurring); City of Villa Rica v. Couch, 281 F.2d 284 (5th Cir. 1960).

(c) The middleman-processor had actual or constructive knowledge of the danger. Parkinson v. California Company, 255 F.2d 265 (10th Cir. 1958); Kapp v. E. I. DuPont de Nemours & Co., Inc., 57 F.Supp. 32 (E.D.Mich.1944); Morris v. Shell Oil Co., 467 S.W.2d 39 (Mo.1971); Hill v. Wilmington Chemical Corp., 279 Minn. 336, 156 N.W.2d 898 (1968); Schneider v. Suhrmann, 8 Utah 2d 35, 327 P.2d 822 (1958). Morton also cites cases in which the middleman is an employer, a physican, or a school, to buttress its argument as to the middleman-processor. In all of these cases the middleman had actual or constructive knowledge of the danger. We hold the opposite in the instant case. See *infra.*

(2) *The acts or omissions of Golden West were not an independent intervening cause.*

Morton states, correctly, that the commingling of Panogen-treated grain with feed supplies, and the giving away of this mixture of treated and untreated grain, was something over which it had no control. Morton then contends that these acts were an independent intervening cause that relieve it of the duty to warn Huckleby.

In New Mexico, "independent intervening cause" is defined in Thompson v. Anderman, 59 N.M. 400, 411–12, 285 P.2d 507, 514 (1955).

The independent intervening cause that will prevent a recovery of [sic] the act or omission of a wrongdoer must be a cause which * * * produces a different result, that *could not have been reasonably foreseen.* [Emphasis added]

See, also, Harless v. Ewing, 80 N.M. 149, 452 P.2d 483 (Ct.App.1969).

■■■ Morton admits that misuse of Panogen-treated grain for feed was foreseeable by Morton. Therefore, the acts by Golden West that caused treated grain to be mixed in with feed supplies do not constitute an independent intervening cause that will relieve Morton of its duty to warn Huckleby. Thompson v. Anderman, supra.

(3) *Golden West did not have actual knowledge of the hazards associated with misuse of Panogen-treated grain for feed.*

"There is no duty to warn of danger actually known to the user of a product * * *." Garrett v. Nissen Corporation, 84 N.M. 16, 21, 498 P.2d 1359, 1364 (1972).

To attempt to establish "actual knowledge", Morton recites the facts which most favor its position. These are not sufficient. To determine the existence of a duty to warn Golden West, as a matter of law, we must view all the facts in arriving at a conclusion on the matter of "actual knowledge". In so viewing the record, we disagree with Morton.

Golden West's men knew that Panogen-15 was "poison". They knew treated grain should not be used for feed. They did *not* know that if treated grain *was*, mistakenly, fed to animals, the poison might be communicated through the meat to human beings. Beyond these points, the record offers no uncontradicted answers to the following questions: Did they know the poison caused serious, permanent injuries to human beings? Did they know it might have no antidote? Did they know the *significance* of the prohibition against using treated grain for feed? Were they aware that even minute quantities (eight

parts per million) mixed in with untreated grain might be harmful?

Furthermore, the record provides no answer to the most critical question: Assuming for the purpose of summary judgment that Golden West's employees did not warn Huckleby of the danger from Panogen-treated grain, *was this because the employees, themselves, did not have adequate knowledge of the danger, or because they were negligent in passing on that knowledge?*

■■■ The record reveals that there is a "substantial dispute" (*Goodman v. Brock,* supra) as to the degree of knowledge possessed by Golden West's employees of the dangers from Panogen-treated grain. There is no basis on which to conclude, as a matter of law, that Golden West had actual knowledge. This is a question of fact for a jury to determine, by weighing the evidence.

(4) *Golden West did not have constructive knowledge of the hazards associated with misuse of Panogen-treated grain for feed.*

■■■ "Constructive knowledge" refers to knowledge that one has the opportunity to possess by the exercise of ordinary care. Attoe v. State Farm Mutual Automobile Ins. Co., 36 Wis.2d 539, 153 N.W.2d 575 (1967); Chase v. Shasta Lake Union Sch. District, 259 Cal.App.2d 612, 66 Cal.Rptr. 517, 37 A.L.R.3d 704 (Ct.App.3d Dist. 1968).

Morton admits that only the Panogen tag and label should be considered for the purpose of determining what warning information Morton communicated to Golden West. Morton contends that the warnings on the tag and label were, as a matter of law, adequate to give Golden West constructive knowledge of the hazards associated with misuse of Panogen-treated grain for feed. That is, by reading the tag and label with ordinary care, Golden West's employees could have become sufficiently aware of the dangers from Panogen to have been able to alert Huckleby to

those dangers. If, as a matter of law, the tag and label were adequate for this purpose, then Golden West did have constructive knowledge, and Morton owed no duty to Huckleby.

Morton provides no authorities to support its contention that the tag and label gave adequate warning, as a matter of law. Morton's argument is that the adequacy of the warning is evident from examination of the tag and label. We disagree. On summary judgment, Huckleby and Golden West must be given the benefit of all reasonable doubts in deciding if a material issue of fact exists. We find seven bases on which to conclude that there is a material issue of fact as to the adequacy of the warning information on Morton's tag and label.

■■■ (a) Adequacy of a warning is a question of fact for the jury. Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076 (5th Cir. 1973); Kritser v. Beech Aircraft Corporation, 479 F.2d 1089 (5th Cir. 1973); Weekes v. Michigan Chrome & Chemical Company, 352 F.2d 603 (6th Cir. 1965); Tucson Industries, Inc. v. Schwartz, 108 Ariz. 464, 501 P.2d 936 (1972); Stevens v. Parke, Davis & Company, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973); Carmichael v. Reitz, 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971); Love v. Wolf, 226 Cal.App.2d 378, 38 Cal.Rptr. 183 (1964); Simonetti v. Rinshed-Mason Company, 41 Mich.App. 446, 200 N.W.2d 354 (1972); Sams v. The Englewood Ready-Mix Corp., 22 Ohio App.2d 168, 259 N.E.2d 507 (1969); Phillips v. Kimwood Machine Company, 525 P.2d 1033 (Or.1974); Anderson v. Klix Chemical Co., 256 Or. 199, 472 P.2d 806 (1970); Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971); Maize v. Atlantic Refining Company, 352 Pa. 51, 41 A.2d 850 (1945).

In their landmark article on the duty to warn, H. C. Dillard and H. Hart explain why adequacy of a warning is a fact question that a jury, not a judge, should decide. While [the McClanahan court, *infra*] decided, as a matter of law, that the duty

to warn of dangers *in use* was not exhausted by giving directions *for use*, it left to the jury the job of determining whether the duty had been fulfilled. * * * This is believed to be proper since, despite all its familiar limitations, the jury remains the institution best suited to reflect the sense of fairness and the conflicting values of a democratic order. *It is best suited to the task because the whole business is a process demanding not so much the authority of the expert as the insight of a layman.* [Emphasis in last sentence added]. H. C. Dillard and H. Hart, II, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 182 (1955).

■■■ (b) The warning must adequately indicate the scope of the danger. "The warning must designate specifically all of the dangers that may cause serious injury; a general warning that the product is dangerous is insufficient." Comment: The Manufacturer's Duty to Warn of Dangers Involved in Use of a Product, Wash.U.L. Qrtrly, 206, 210 (Spring, 1967). The warning must indicate latent dangers. Gonzalez v. Virginia-Carolina Chem. Co., 239 F.Supp. 567 (E.D.S.C.1965); McClanahan v. California Spray-Chem. Corp., 194 Va. 842, 75 S.E.2d 712 (1953); Boyl v. California Chem. Co., 221 F.Supp. 669 (D. Or.1963); Simonetti, supra. *Contra*, E. I. DuPont de Nemours and Co. v. Baridon, 73 F.2d 26 (8th Cir. 1934); Kaempfe v. Lehn & Fink Prods. Corp., 21 A.D.2d 197, 249 N.Y.S.2d 840 (1964), appeal dismissed, 18 N.Y.2d 784, 275 N.Y.S.2d 268, 221 N.E. 2d 809 (1966).

Huckleby contends that the scope of Morton's warning was inadequate in three ways: (1) It did not alert the user to possible livestock and other animal poisoning. (2) It did not warn of secondary food chain effects of poisoning. (3) It did not warn of the necessity to safely store treated grain apart from other grain.

■■■ (c) "The warning must reasonably communicate the extent or seriousness

of harm that could result from the danger * * *." Duty to Warn, Wash.U.L. Qrtrly, supra, at 212.

Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. Tampa Drug Co. v. Wait, 103 So.2d 603, 609 (Fla.1958).

In accord are: Rumsey v. Freeway Manor Minimax, 423 S.W.2d 387 (Tex. 1968); Haberly v. Reardon Co., 319 S.W. 2d 859 (Mo.1958); Weekes v. Michigan Chrome & Chemical Company, 352 F.2d 603 (6th Cir. 1965) (concurring opinion).

Huckleby contends that the intensity of Morton's warning was inadequate in the following respects: (1) "May be fatal" is insufficient. (2) "[T]oxic" is too vague. (3) The antidote statement is misleading in that it indicates that a simple antidote counteracts the poison. (4) There is no warning that small quantities of treated grain ("sweepings") may be lethal.

■ (d) The physical aspects of the warning—conspicuousness, prominence, relative size of print, etc.,—must be adequate to alert the reasonably prudent person. Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (4th Cir. 1962); *Maize,* supra; Gardner v. QHS, Inc., 448 F.2d 238 (4th Cir. 1971); Bean v. Ross Mfg. Co., 344 S.W.2d 18 (Mo.1961); Crane v. Sears Roebuck & Co., 218 Cal.App.2d 855, 32 Cal.Rptr. 754 (1963).

Huckleby contends that the Morton warning was inadequate in this respect, as follows. (1) The warning on the label about dangers from treated seed is placed in the midst of other information. (2) The second smallest size type on the label is used for this warning. (3) These warning statements are set apart from the "flamboyant red section" of the label, which contains warnings of other dangers.

■ (e) The means used to convey the warning must be adequate. Sterling Drug, Inc. v. Yarrow, 408 F.2d 978 (8th Cir. 1969) ("Dear Doctor" letter was inadequate; failure of the company to use its "detail men" to relay the warning was one of the inadequacies in the warning). See, also, Noel, "Products Defective Because of Inadequate Warning," 23 S.W.L.J. 256, 285 (1969).

In general, in selling Panogen, Morton did rely on means other than the label and tag to convey the warning; for example, detail men, posters, circulars, montages. However, the record indicates that these other means were not used in the sale of Panogen to Golden West, and for the purposes of this motion, Morton relies only on the label and tag. Huckleby contends that the absence of these other means made the warning inadequate.

■ (f) A simple directive warning (e. g., "Do not use * * *") may be inadequate, without some indication of consequences from failure to follow the directive. *Maize,* supra; *Tampa Drug Co.,* supra; *McClanahan,* supra; *Bean,* supra; Saporito v. Purex Corp., 40 Cal.2d 608, 255 P.2d 7 (1953); Williams v. Caterpillar Tractor Co., Inc., 149 So.2d 898 (Ct.App. Fla.1963); Tucson Industries, Inc. v. Schwartz, supra; D'Arienzo v. Clairol, Inc., 125 N.J.Super. 224, 310 A.2d 106 (1973); Murray et al. v. Wilson Oak Flooring Co., Inc., 475 F.2d 129 (7th Cir. 1973); Panther Oil & Grease Manufacturing Company v. Segerstrom, 224 F.2d 216 (9th Cir. 1955); Alman Bros. Farms & Feed Mill, Inc. v. Diamond Lab., Inc., 437 F.2d 1295 (5th Cir. 1971).

Huckleby contends that the label and tag do not give a "full appreciation of the purposes of the directive statements", and that this contributes to the inadequacy of this warning.

■ (g) Failure to warn of danger from waste products may cause a warning to be inadequate. *Boyl,* supra. Huckleby contends that the only statement which applies to waste, found on the label, refers only to liquid wastes from the Panogen treatment, and does not indicate the danger from "sweepings".

We conclude that the adequacy of Morton's warning information is a question of fact for the jury. Therefore, we cannot say, as a matter of law, that Golden West had constructive knowledge of the dangers from misuse of Panogen-treated grain as feed.

*Conclusion on Plaintiffs' Negligence Theory*

None of Morton's contentions sustains its position that its right to rely on Golden West to use ordinary care relieved Morton of its duty to warn Huckleby. We conclude that Morton did have a duty to Huckleby. Therefore, Huckleby (and Golden West, on its cross-claim) should go to the jury to determine whether Morton was negligent in meeting that duty.

G. *Huckleby has a claim against Morton on special liability for physical harm to Huckleby (Restatement, Torts, 2d § 402A)*

Liability pursuant to Restatement, Torts, 2d § 402A was adopted in New Mexico in 1972. Stang v. Hertz Corporation, 83 N. M. 730, 497 P.2d 732 (1972). See, also, Standhardt v. Flintkote Company, 84 N.M. 796, 508 P.2d 1283 (1973); Garrett v. Nissen Corporation, supra; Sutton v. Chevron Oil Company, 85 N.M. 604, 514 P.2d 1301 (Ct.App.), aff'd, 85 N.M. 679, 515 P.2d 1283 (1973).

Paraphrasing the pertinent parts of § 402A: A manufacturer of a product (1) in *a defective condition, unreasonably dangerous* (2) *to the user or consumer,* is subject to liability if the manufacturer expects its product to reach the user or consumer, and the product does reach the user or consumer (3) *without substantial change in the condition in which it is sold,* even though the manufacturer has exercised all possible care in the preparation and sale of the product.

(1) *A question of fact for the jury exists as to, whether Panogen-15 was in "a defective condition unreasonably dangerous * * *." (§ 402A)*

Where the manufacturer has reason to anticipate danger from a particular use of his product, an adequate warning must be given. A product sold without such a warning is in a "defective condition unreasonably dangerous * * *." Restatement, Torts 2d § 402A, and Comments h, i; Schrib v. Seidenberg, 80 N.M. 573, 458 P.2d 825 (Ct.App.1969); Patch v. Stanley Works (Stanley Chemical Co. Div.) 448 F.2d 483 (2nd Cir. 1971); Alman Bros. Farms & Feed Mill, Inc. v. Diamond Lab., Inc., supra; Brizendine v. Visador Co., 305 F.Supp. 157 (D.Or.1969); Tucson Industries, Inc. v. Schwartz, supra; Barth v. B. F. Goodrich Tire Co., 265 Cal. App.2d 228, 71 Cal.Rptr. 306 (1968); Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 46 Cal.Rptr. 552 (1965); Crane v. Sears Roebuck & Co., supra; Williams v. Brown Mfg. Co., 93 Ill.App.2d 334, 236 N.E.2d 125 (1968); Anderson v. Klix Chemical Co., supra.

We have already determined that the adequacy of Morton's warning is a question of fact for the jury. An inadequate warning places a product in a "defective condition unreasonably dangerous * * *." We conclude that a question of fact for the jury exists as to whether Panogen-15 was in a "defective condition unreasonably dangerous * * *" under § 402A.

(2) *Huckleby was a "user or consumer".*

The phrase "user or consumer" in § 402A is explained in Comment 1.

In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller * * *. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated

is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant. Restatement, Torts, 2d § 402A, comment 1, at 354.

Morton admits that it owes a duty to one who engages in a foreseeable misuse of its product, and that Huckleby's misuse of Panogen-treated grain was foreseeable. "[T]he benefits of the rule of strict liability extend 'to all whom the manufacturer should reasonably expect to use his product.'" Jackson v. Standard Oil Company of California, 8 Wash.App. 83, 505 P.2d 139, 149 (Ct.App.1972).

■ Huckleby was a "user or consumer", within the meaning of that phrase in § 402A.

(3) *Panogen-15 reached Huckleby without a substantial change in the condition in which it was sold.*

The only remaining issue to determine is whether Panogen-15 reached Huckleby without substantial change in the condition in which it was sold by Morton.

Comment p to § 402A states (at 357):

It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section . . . . The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes.

"Comment (p) to Section 402A explains that a substantial change involves situations where the *product itself* will undergo processing or substantial modification such that the product originally sold is not *itself* in a final or remotely usable state * * *." [Emphasis added] Dorsey v. Yoder Company, 331 F.Supp. 753, 764 (E.D.Pa.1971).

Here the product in question is Panogen-15, which was sold by Morton to Golden West in 55 gallon drums. The product obtained by Huckleby from Golden West was treated grain. However, the record reveals that the treatment process was simply a procedure for spraying Panogen-15 onto the grain. *Treated grain = grain + Panogen-15.* Panogen-15, the product sold by Morton, did not undergo change when it was made a part of the treated grain.

Compare Walker v. Stauffer Chemical Corporation, 19 Cal.App.3d 669, 96 Cal. Rptr. 803 (1971), where the physical composition of the product, sulfuric acid, did undergo change in processing. See, also, Dennis v. Ford Motor Company, 332 F.Supp. 901 (W.D.Pa.1971) (for substantial change in the product to relieve a manufacturer of liability, the change must be causally connected to the accident).

It is most accurate to think of Panogen-15 as a *component part* of treated grain, the finished product. In a *Caveat,* the authors of § 402A state that they express no opinion as to whether liability under § 402A attaches to the "seller of a component part of a product to be assembled". However, a guideline is provided in Comment q to § 402A (at 358):

q. *Component parts.* * * * It is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer.

The courts have followed Comment q in holding that the manufacturer of a component part is subject to liability *if that part has not itself been changed* when added onto the finished product. Symons v. Mueller Company, 493 F.2d 972 (10th Cir. 1974); Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3rd Cir. 1969); Burbage v. Boiler Engineering and Supply Co., 433 Pa. 319, 249 A.2d 563 (1969).

■ Panogen-15 did not itself undergo change when it was sprayed onto the grain to make it treated grain, the finished product. Therefore, under the reasoning of Comments p and q, and the cases that interpret those Comments, Panogen-15 did

not undergo substantial change in the condition in which it was sold by Morton.

(4) *Public Policy and Liability Under §
402A*

We have determined that the facts of this case meet the criteria for concluding that a question of fact exists on the theory of liability pursuant to § 402A, a manufacturer's special liability.

Social policy has led courts in every jurisdiction to adopt rules allowing plaintiffs to proceed against manufacturers on a theory of strict liability for a defective product. Policy reasons also compel our conclusion in this case. (See W. L. Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1122–23 (1960), on the following policy reasons (1) and (2).)

(1) Public interest in human life, health and safety requires that the law give consumers maximum protection against dangerous product defects.

(2) By placing goods on the market, a manufacturer represents to the public that they are safe; and by packaging and advertising, he does everything possible to further induce that belief. The middleman, in contrast, is no more than a conduit through which the product reaches the ultimate user. The manufacturer should not be permitted to avoid liability by asserting his lack of direct contact with the user.

(3) The marketing of dangerously defective products can have tragic consequences. Allowing injured plaintiffs to proceed on a theory of a manufacturer's liability, without the necessity of proving negligence, will cause manufacturers to take cautionary steps to prevent the marketing of dangerously defective products. Such preventive measures may avert tragedies such as befell the Huckleby family, and thereby save our system the cost of lawsuits such as this one.

Where a defendant's product is adjudged by a jury to be dangerously defective, imposition of liability on the manufacturer will cause him to take some steps (or at least make calculations) to improve his product . . . . .
We suspect that, in the final analysis, the imposition of liability has a beneficial effect on manufacturers of defective products both in the care they take and in the warning they give.

Phillips v. Kimwood Machine Company, supra, at 1041–42.

Material issues of fact exist under the doctrine of special liability, § 402A. Morton was not entitled to summary judgment.

H. *Golden West is entitled to proceed
on cross-claim against Morton on issue of contribution.*

Golden West filed a cross-claim against Morton on two counts. (1) Contribution and indemnity in the event of a recovery by Huckleby against Golden West; (2) Golden West is entitled to damage caused to its business, both compensatory and exemplary. The trial court awarded Morton summary judgment on the claims of Golden West because there was no genuine issue of material fact. Golden West adopted the position and arguments of Huckleby as set forth in his brief on appeal.

Golden West and Morton agree that Golden West may proceed on its cross-claim against Morton on the issue of contribution, in the event of a recovery by Huckleby against Golden West. Upon this ground the summary judgment is reversed.

The parties disagree on Golden West's right to indemnity. Golden West has presented no argument or authority to show it is entitled to indemnity. We hold that the summary judgment is affirmed on this issue.

Golden West also claims it is entitled to damage caused to its business by Morton, both compensatory and exemplary. It has presented no argument or authority to show that a genuine issue of material fact exists to support its cross-claim against Morton for damages. The summary judgment is affirmed on this claim.

The summary judgment is reversed on the claim of contribution.

### I. *Summary*

We hold that summary judgment is reversed with respect to Huckleby's complaint on the theories of: (a) negligence as to the warning; and (b) manufacturer's liability pursuant to Restatement, Torts, 2d § 402A. Summary judgment is reversed with respect to the cross-claim by Golden West, only as to its claim for contribution.

Reversed.

It is so ordered.

HERNANDEZ and LOPEZ, JJ., concur.