724 P.2d 765

**Debra Lynn BURGI, Personal Representative of the Estate of Danny W. Burgi, Deceased, Plaintiff-Appellant,**

v.

**ACID ENGINEERING, INC., a Corporation, and Karen Simpkins, Personal Representative of the Estate of Bobby R. Simpkins, Deceased, Defendants-Appellees.**

**No. 8967.**

Court of Appeals of New Mexico.

July 17, 1986.

Certiorari Denied Aug. 20, 1986.

U. Edward Schissel, Jr., Neal & Neal, Hobbs, for plaintiff-appellant.

R.E. Richards, Law Offices of R.E. Richards, P.A., Hobbs, for defendants-appellees.

## OPINION

FRUMAN, Judge.

This is an appeal from an order granting summary judgment in favor of defendants in a wrongful death action. Plaintiff is the personal representative of the estate of her husband, Danny W. Burgi, who died as a result of hydrogen sulfide intoxication while engaged in his employment with A.A. Oilfield Service, Inc. (A.A.). The trial court found that defendants' motion for summary judgment was "well taken" and dismissed the case with prejudice. The grounds for defendants' motion were: there were no disputed issues of material facts; they were entitled to judgment as a matter of law; and defendants did not breach any lawfully imposed duty to decedent. We reverse.

### TESTIMONY

On December 30, 1984, during the course of his employment, decedent was assigned to clean out a "frac tank" located at A.A.'s petroleum by-product treatment facility and disposal site. The frac tank contained basic sediment and water, or sludge. Defendant Acid Engineering, Inc. (Acid Engineering) prepared and used acid solutions to clean, among other things, equipment used in the petroleum industry. Plaintiff's affidavit in response to defendants' motion for summary judgment alleged that Acid Engineering negligently failed to warn decedent and other employees of A.A. that its waste fluids, which contained an acid solution, would produce toxic gases when mixed with the sludge.

Acting pursuant to an on-going business relationship with A.A., Acid Engineering instructed several of its employees to dispose of an acid solution, or flush water, at

the A.A. site on December 30, 1984. Ordinarily, Acid Engineering's flush water was disposed of at that site, by its own employees, but not into the frac tank. On that date, decedent and several other A.A. employees attempted to clean the frac tank. Heated water was jetted into the tank at high pressure to try to wash out the residual oily sludge. Finding this method to be unsuccessful, and as a result of informal discussions between employees of A.A. and Acid Engineering, it was decided to pour some of Acid Engineering's flush water into the tank to help loosen the sludge.

Most of the witnesses agree that decedent had first entered the frac tank to check the depth level of the sludge after heated water was hosed into the tank but before the flush water was poured. At least one witness inferred that decedent first entered the tank after the flush water was introduced. Even so, decedent entered the tank at least once after the flush water was poured in, and was seen to fall or slip into the sludge. An employee of Acid Engineering rushed into the frac tank to rescue decedent, and he, too, fell upon entering the tank and likewise died of hydrogen sulfide intoxication. Neither decedent nor his would-be rescuer revived after entering the tank. Although some witnesses told decedent to put his mask on, none who witnessed decedent's fall and predicament initially suspected the presence of gas— each thought that decedent had slipped while in the tank.

The uncontradicted testimony is fundamentally as follows: it is common knowledge that the presence of toxic gases is to be expected in many closed spaces in the petroleum industry; air supplying devices or air masks should be worn every time one enters a closed space where the presence of toxic gases can be anticipated; hydrogen sulfide gas is toxic and its presence can be anticipated; and hydrogen sulfide, in large amounts, can deaden an individual's senses and ability to detect its presence by smell. More particularly, the uncontradicted testimony is that: decedent had been to several hydrogen sulfide training schools, although there is no mention as to what he was taught at these schools; decedent knew that he should wear an air mask at all times when entering the frac tank because of the possibility of the presence of toxic gases; A.A. employees told decedent several times to put on an air mask before his first entry into the frac tank on December 30th; decedent did not manifest any physical or other effects upon his first entry into the tank that day; A.A. employees and an Acid Engineering employee again told decedent to put on an air mask as he was descending into the frac tank for the second, fatal time; and, decedent did not wear an air mask during either entry.

Additional uncontradicted testimony is that: the employees of Acid Engineering who were present at the A.A. disposal facility had not been formally trained regarding hydrogen sulfide gas; those employees had not been trained regarding safety considerations or the possibility of hazards in the dumping or disposal of the acid solution flush water; and such considerations had not been discussed with them by either their employer or any employee of A.A.

There is conflicting testimony as to the presence of the odor of hydrogen sulfide gas before decedent made his second tank entry. There are also conflicting opinions as to whether hydrogen sulfide gas would be expected to be produced in the tank upon the introduction of the flush water. While Acid Engineering employees said they did not expect that hydrogen sulfide gas would be produced upon the addition of the flush water into the sludge, there is an inference that they knew that a chemical or physical reaction of some type would occur since they suggested that the flush water would loosen the sludge for easier removal. A question also exists as to whether the heated water jetted into the frac tank prior to the pouring of the flush water was responsible for the production of hydrogen sulfide gas. Also, a consultant who reviewed the circumstances of the accident was seemingly unaware of the pumping of heated water under high pressure into the frac tank.

Conflicting inferences may be drawn from the following: decedent's specific training with respect to hydrogen sulfide and whether he could anticipate its presence in this instance; whether decedent knew of at least one prior pouring of flush water into the frac tank and the results; whether decedent knew that flush water had been poured into the frac tank on the day at issue, or the possible results of that action (while it seems he was present during the pouring, there is no testimony as to what decedent may have actually seen or heard regarding the composition or use of the flush water); whether any of Acid Engineering's employees knew that decedent had previously entered the tank without the use of an air mask and without consequence; when it became noticeable that the sludge was bubbling; and, whether the advice from an Acid Engineering employee to decedent to put on an air mask indicates a superior knowledge of the danger awaiting decedent.

### SUMMARY JUDGMENT

The rules used in evaluating a motion for summary judgment are set out in *Akre v. Washburn*, 92 N.M. 487, 590 P.2d 635 (1979) (quoting *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.*, 88 N.M. 74, 80, 537 P.2d 682, 688 (Ct.App.), *cert. denied*, 90 N.M. 48, 536 P.2d 1085 (1975)):

(1) A summary judgment proceeding is not to decide an issue of fact, but, rather, to determine whether one exists.

(2) Summary judgment can be granted only where the record shows there is no genuine issue as to any material fact.

(3) The party opposing the motion for summary judgment must be given the benefit of all reasonable doubts in determining whether an issue of fact exists.

(4) Summary judgment can be granted only where the moving party is entitled to the judgment as a matter of law, upon clear and undisputed facts.

(5) Summary judgment proceedings must not be used as a substitute for trial.

Even where the basic, material facts are not in dispute, but where equally logical, but conflicting, reasonable inferences can be drawn from those facts, a grant of summary judgment is improper. *Yeary v. Aztec Discounts, Inc.*, 83 N.M. 319, 491 P.2d 536 (Ct.App.1971); *see Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972).

The question of a litigant's negligence is ordinarily reserved for the trier of fact. But, the question becomes one of law when reasonable minds cannot differ as to the facts and when the reasonable inferences which can be drawn from the facts are plain, consistent and uncontradicted. At that point, the court may then decide the question. *Stake v. Woman's Division of Christian Service of the Board of Missions*, 73 N.M. 303, 387 P.2d 871 (1963); *Harless v. Ewing*, 80 N.M. 149, 452 P.2d 483 (Ct.App.1969).

### LEGAL DUTY

The question of whether Acid Engineering owed a legal duty to decedent (such as to avoid the production of hydrogen sulfide gas or to warn of the danger in entering the frac tank) is a question of law. *See Schear v. Board of County Commisioners of the County of Bernalillo*, 101 N.M. 671, 687 P.2d 728 (1984); *Jones v. Minnesota Min. and Mfg. Co.*, 100 N.M. 268, 669 P.2d 774 (Ct.App.1983); *Harmon v. Atlantic Richfield Co.*, 95 N.M. 501, 623 P.2d 1015 (Ct.App.), *cert. denied*, 95 N.M. 593, 624 P.2d 535 (1981); *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.* But, where factual conflicts are shown, and where legal defenses such as "no duty" do not clearly appear as a matter of law, it is improper to grant summary judgment. *See Skarda v. Skarda*, 87 N.M. 497, 536 P.2d 257 (1975). The evidence of decedent's own negligent acts cannot be used as a basis for granting summary judgment. *See Sweenhart v. Co-Con, Inc.; Villanueva v. Nowlin*, 77 N.M. 174, 420 P.2d 764 (1966).

If Acid Engineering had reason to believe decedent knew of or realized the danger upon his second entry, it would not have had a legal duty to alert or inform

him of the danger. *See High Voltage Engineering Corp. v. Pierce,* 359 F.2d 33 (10th Cir.1966); *Marker v. Universal Oil Products Co.,* 250 F.2d 603 (10th Cir.1957); *Jones v. Minnesota Min. and Mfg. Co.; cf. Villanueva v. Nowlin.*

The statements of the witnesses, as indicated above, do not lead to the reasonable conclusion or inference that decedent knew of or realized the presence of toxic hydrogen sulfide gas. Decedent had entered the frac tank a short time previously, without wearing a mask, and apparently did not suffer any consequences. There is conflicting testimony as to whether the odor of hydrogen sulfide gas was detected. There is testimony from several witnesses that hydrogen sulfide gas could be expected, yet none of the observers of the accident thought that hydrogen sulfide gas was present, even as they saw decedent fall. There is inferential evidence that decedent knew that flush water had been introduced, but there is no evidence that he knew it contained acid, and no evidence that he observed the sludge "boil," which would indicate the formation and release of gas. While decedent had received hydrogen sulfide training and had been instructed to always wear an air mask when entering the tank (and that this was the policy of A.A.), there is little, if any, evidence that he knew he was about to expose himself to changed circumstances within the tank's environment.

More importantly, a material disputed issue of fact exists as to whether Acid Engineering knew or should have known that pouring flush liquids into the tank could have created a dangerous, changed condition, and whether this knowledge created a duty to warn decedent of peril, regardless of the fact that its employees suggested to decedent that he wear a mask. The existence of this material disputed issue of fact is partially based upon the affidavit of Frank H. Sartor, filed in opposition to the motion for summary judgment. Sartor is a consulting engineer who describes himself as having expertise in chemical reactions, safety standards and procedures in the chemical industry, with a particular background in chemical engineering and the chemical industry. In Sartor's opinion, at least two of Acid Engineering's employees at the scene during this incident should have known that introducing the flush fluid into the tank presented a significant risk of toxic gas and other hazards; should have given warnings regarding those hazards and prohibited decedent from entering the frac tank; and should have had breathing apparatus available for escape from a toxic atmosphere.

While we do not resolve any of these factual issues as to the knowledge or realization of decedent, or as to the actual or imputed knowledge of Acid Engineering's employees, by applying the rules relating to the evaluation of a motion for summary judgment, we have determined that disputes as to these issues do exist. *See Hinojosa v. Nielson,* 83 N.M. 267, 490 P.2d 1240 (Ct.App.), *cert. denied,* 83 N.M. 259, 490 P.2d 1232 (1971).

Likewise, if the danger to which decedent exposed himself was open and obvious, defendant Acid Engineering would not have had a legal duty to alert or inform decedent. *See Michael v. Warner/Chilcott,* 91 N.M. 651, 579 P.2d 183 (Ct.App.), *cert. denied sub nom. Robbins v. Michael,* 91 N.M. 610, 577 P.2d 1256 (1978); *Villanueva v. Nowlin.*

This review of the witnesses' statements does not lead to the reasonable conclusion or logical inference that the danger of hydrogen sulfide was open and obvious. It is not a logical inference to say that the decedent purposely entered the frac tank knowing he would die. It is not a logical inference to say that the workmen present on the scene nonchalantly let decedent enter an open and obvious death trap. It is not a logical inference to say that the man who first rushed to decedent's aid would not have taken precautions for his own self if it was open and obvious he was rushing to his death. From these observations, and by applying the summary judgment rules, we again determine the existence of a conflict in the testimony as to whether the danger was open and obvious and whether a duty to warn arose.

In making these observations and determinations, we do not imply, to any extent, that plaintiff has succeeded in making a case of negligence, that Acid Engineering did have a duty to warn decedent, or that, if it had a duty to warn, the warnings were either adequate or inadequate. *See generally Michael v. Warner/Chilcott; First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.* Our opinion only entitles plaintiff to present the merits of her case to the fact finder. *See Sandoval v. Board of Regents of New Mexico State University,* 75 N.M. 261, 403 P.2d 699 (1965); *Coca v. Arceo,* 71 N.M. 186, 376 P.2d 970 (1962). This is so even if the trial judge believes that ultimately a directed verdict against the plaintiff would be warranted. *Coca v. Arceo; Johnson v. J.S. & H. Construction Co.,* 81 N.M. 42, 462 P.2d 627 (Ct.App.1969).

Therefore, this cause is remanded for reinstatement by the trial court, for the setting aside of the order granting the motion for summary judgment and dismissing the cause, and for the cause to proceed in a manner consistent with this opinion.

IT IS SO ORDERED.

DONNELLY and GARCIA, JJ., concur.