669 P.2d 744

**Virginia JONES, as the Personal Representative of the Estate of Donald Jones, Deceased, and Virginia Jones, Individually, and Mr. and Mrs. Arthur Young, Plaintiffs-Appellants,**

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, a/k/a "3M Company", Defendant-Appellee.**

**No. 6094.**

Court of Appeals of New Mexico.

Sept. 1, 1983.

Paul Livingston, Steven E. Schonberg, P.C., Albuquerque, for plaintiffs-appellants.

Steven L. Tucker, Judith C. Herrera, Jones, Gallegos, Snead & Wertheim, P.A., Santa Fe, for defendant-appellee.

## OPINION

WOOD, Judge.

Young and Jones received permanent implants of radioactive I–125 (Iodine-125) in

the treatment of cancer of the prostate. For the purposes of this appeal, it is not disputed that they received excessive radiation, and the excessive radiation caused the injuries. This appeal involves only the claims against 3M (Minnesota Mining and Manufacturing Company) for the injuries to Young and Jones. The trial court granted summary judgment in favor of 3M. The appeal involves the propriety of the summary judgment, specifically, whether there was a genuine issue of fact requiring trial. *See Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972). We: (1) set forth the background of the litigation; (2) identify limitations in the appellate record; (3) discuss the products liability contentions; and (4) discuss the warranty contentions.

*Background*

Two physicians, radiotherapists Simmons and Murrell with prior experience in utilizing other isotopes in the treatment of cancer, and in treatment of cancer of the prostate, undertook in 1977 to treat cancer of the prostate by implanting I–125. Between December 1977 and the summer of 1979, Simmons and Murrell implanted I–125 in the prostates of eighteen patients. Although the briefs do not correlate Young or Jones with a particular number, our reckoning is that their place in the sequence was approximately patients twelve and thirteen. There is some uncertainty as to which physician performed a particular implant, but this is of no consequence in this appeal. The patients were common patients of both physicians.

The I–125 implanted was in the form of seeds. The radioactive strength of the seed was expressed in millicuries, compensated. Because the strength of the seed lessens with the passage of time, the shipping documents stated the strength on an assay date. The strength at time of implant was determined by use of a decay chart. There is no dispute, in this appeal, that the strength of the seeds implanted in Young and Jones was .56 millicuries at the time of the implants.

The radiation intended to be delivered by the implant is determined by the seed strength, the size of the prostate (stated as average dimension of the prostate, in centimeters) and the spacing of the seeds, also stated in centimeters. We refer to the intended dosage as the desired dose. "In almost all cases the volume to be irradiated corresponds to the entire prostate. It was not the practice of the physicians to prescribe limiting doses to the bladder, rectum or other normal tissues."

The actual dosage is computed after the implant; this is referred to as dosimetry. The computations were for a minimum peripheral dose, defined as the minimum dose to any point on the margin of the prostate.

The computations require information as to the location and number of seeds implanted. This information was obtained from right orthogonal films consisting of an AP and lateral view. With this information, and the known seed strength, the actual dosage can be calculated. The calculation can be performed manually, but it is a chore because calculations must be made for each seed. These calculations involve the distance between seeds and the contribution of each seed. A computer can perform these calculations; a computer and a software program were purchased; the calculations were made by using the computer and the software program. There is no issue in this appeal as to the propriety of using a computer program for these calculations.

The computer calculations provided dosage information in terms of rads per hour. To determine actual dosage, rads per hour must be converted to rads to total decay because the radiotherapist needed to know the total rads. Total rads means rads in a year. The initial computer program did not make this conversion; it was done, manually, by the dosimetrist, Sachs. There is evidence that a manual conversion was performed in the Young and Jones cases.

After the conversion was made, a chart was prepared showing isodose curves, which are defined as lines of uniform dosage. The radiotherapist determines which is the appropriate isodose curve and, in doing so, considers the size of the cancer and the

shape of the curves. The appropriate iso-dose curve shows the total rads or total dose.

The hospital records for Young show a total dose of 16,000 rads; a correction sheet in those records indicates the total dose was 75,000 rads. The hospital records for Jones indicate a total dose between 14,000 and 18,000 rads and a corrected dose of 74,664 rads. The lesser dosage shown for both patients was based on a factor of 445 in converting rads per hour to total rads. This conversion factor was erroneous; the corrected and greater dosage was based on the correct conversion factor of 2074. The desired dose, for both patients, had been a total dose between 16,000 and 24,000 rads. The corrected dose was excessive.

*Limitations in the Appellate Record*

The Young-Jones damage claims were asserted against multiple defendants. This appeal involves only 3M, the manufacturer of the seeds. Two general theories of liability were asserted against 3M—products liability and breach of warranty. Summary judgment was granted in favor of 3M on both liability theories.

The trial court identified seven depositions that it had considered in granting summary judgment. Plaintiffs' request for the record proper and for a transcript of proceedings did not ask that all of the seven depositions be included in the appellate record. Portions of the seven depositions were included, as attachments, to pleadings filed in the trial court and are before us as part of the record proper. 3M requested, *see* NMSA 1978, Civ.App.R. 7(b) (Cum.Supp. 1983), the depositions of Simmons, Murrell and Sachs. Those depositions are before us. 3M also requested all the exhibits to the depositions of Simmons and Murrell. We do not know of what "all" of the exhibits consists. We have Exhibits 12 and 13, found at the back of Volume II of Simmons' deposition, and a separate box of exhibits numbered 27 through 69 and 92 through 108.

Our decision is based on the following appellate record: (a) the exhibits identified in the preceding paragraph; (b) the deposi-

tions of Simmons, Murrell and Sachs; (c) the portions of the depositions of Kelsey, Anderson, Leavitt and Syed included in the record proper. Plaintiffs attached to their reply brief portions of depositions not included in the record proper; we have not considered these attachments to the reply brief because they are not part of the appellate record.

*Products Liability Contention*

A. Identifying the Issues to be Decided

Because plaintiffs' briefs make extensive scattershot arguments, we identify the products liability issues to be decided in this appeal.

1. Products liability law applies.

The claims against 3M were that the radioactive seeds were dangerous products and were products for the purpose of products liability, that 3M failed to adequately warn users of the seeds of the dangers of implanting the seeds into patients, and that because of an inadequate warning the seeds were defective. Plaintiffs argue, extensively, in their brief-in-chief, that products liability law is applicable to their claims against 3M. *See generally Stang v. Hertz Corporation*, 83 N.M. 730, 497 P.2d 732 (1972). 3M does not claim that products liability is inapplicable; rather, it points out that its motion for summary judgment was based on products liability.

2. Duty to warn.

Plaintiffs contend that 3M had a duty to give adequate or proper warnings. *See* Restatement (Second) of Torts § 402A, Comments h and k (1965). One of the trial court's conclusions was that 3M had no duty to "give warning which would be extensive enough to educate the treating physicians in correct treatment procedures." Plaintiffs argue the duty to warn in terms of foreseeability and misuse. *See* NMSA 1978, UJI Civ. 14.15 (Repl.Pamp.1980), the Committee Comment. This appeal does not involve the extent of the duty to warn. 3M agrees that, as a general proposition, there is a duty to warn, but any such duty was

not applicable in these cases. The parties agree that, under the circumstances of these cases, any warnings to be given would be to the radiotherapists. *Perfetti v. McGhan Medical,* 99 N.M. 645, 662 P.2d 646 (Ct.App.1983); *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075 (Ct.App. 1974).

3. Factual issue as to adequacy of 3M's warnings.

Literature issued by 3M, or for which it appears to be responsible, are Exhibits 12, 13, the portion of 39 which begins *"I–125 SEEDS.* FOR PROFESSIONAL USE ONLY[,] Revised: February 1978", 93, 94 and possibly 92. Deposition questioning went into the "adequacy" of various statements in the publications, but most of this questioning is not pertinent to the warning aspect of these cases. The warning aspect in these cases goes to the warnings as to excessive dosages of radiation.

As to excessive dosage, plaintiffs assert there is a factual issue as to the adequacy of the warnings. We need not identify the specific arguments because adequacy of the warnings is not an issue in the appeal. Summary judgment was not granted on the basis of adequate warnings. The trial court's ruling, quoted hereinafter in paragraph A(5), was that any appropriate warning would have added nothing to the knowledge of the radiotherapists.

4. Actual knowledge.

3M contends the radiotherapists had actual knowledge of the dangers involved. On the basis of actual knowledge, 3M asserts either there was no duty to warn or that any duty to warn had been satisfied. *See Perfetti v. McGhan Medical.*

Plaintiffs do not rely on a specific products liability concept. They argue "unreasonably dangerous" and "unavoidably unsafe" products as if they were interchangeable concepts; they do so by asserting the seeds were "inherently" dangerous. *See Restatement* § 402A, Comments i and k. It makes no difference in this appeal whether the seeds, and their use, are classified as unreasonably dangerous or unavoidably unsafe. 3M's "actual knowledge" contention has been considered applicable to the warning requirement under both concepts. *Restatement* § 402A, Comment j; UJI Civ. 14.15; *Perfetti v. McGhan Medical; Hines v. St. Joseph's Hospital; see Mulder v. Parke Davis & Company,* 288 Minn. 332, 181 N.W.2d 882 (1970).

5. Trial court's ruling.

Concerning the facts, the trial court ruled:

1. The facts show that the seeds were radioactive.

2. The facts show that the treating physicians and entities were fully aware of the radioactive nature of the seeds, and fully appreciated the risks and consequences of excessive dosages of radiation.

3. Any appropriate warning would have added nothing to the physician's or patient's knowledge in this situation.

The trial court concluded:

B. 3M fulfilled its duty to warn the treating physicians and entities involved in this lawsuit because all such persons knew that the I–125 seeds were radioactive.

6. Basis for summary judgment.

Plaintiffs assert that summary judgment was granted on the basis "that the doctors knew the seeds were radioactive and that was all the warning needed." This is a misreading of the ruling and apparently is based on the trial court's conclusion without regard to the factual rulings. The factual rulings are that the radiotherapists were fully aware of the radioactive nature of the seeds, fully appreciated the risks and consequences of excessive dosages and any appropriate warning would have added nothing. Summary judgment was granted on the basis of "actual knowledge".

7. Issues to be decided.

Anticipating our discussion in paragraph 6, plaintiffs assert: (a) the actual knowledge requirement is not to be applied to

avoid the issue of adequate warnings, and (b) even if the actual knowledge requirement applies, there is a factual issue as to the extent of the radiotherapists' knowledge. These are the two issues to be decided.

### B. Applicability of Actual Knowledge Requirement

#### 1. New Mexico law—generally.

*Garrett v. Nissen Corporation,* 84 N.M. 16, 21, 498 P.2d 1359 (1972), states:

> There is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence under § 388 Restatement (Second) of Torts (1965) or on strict tort liability under § 402A Restatement (Second) of Torts, supra.

*See also Skyhook Corp. v. Jasper,* 90 N.M. 143, 560 P.2d 934 (1977).

*Michael v. Warner/Chilcott,* 91 N.M. 651, 655, 579 P.2d 183 (Ct.App.1978), states: [W]here the party is aware of the danger, the warning will serve no useful purpose and is unnecessary, and there is no duty to warn against risks which are open and obvious.

*See also Richards v. Upjohn Co.,* N.M. 675, 625 P.2d 1192 (Ct.App.1980).

UJI Civ. 14.15 states: "The supplier has no duty to warn of risks which he can reasonably expect to be obvious or known to foreseeable users of the product." The rationale for the knowledgeable user exception is that knowledge of the danger is equivalent to prior notice, "no one needs notice of that which he already knows." *Billiar v. Minnesota Mining and Mfg. Co.,* 623 F.2d 240, 243 (2nd Cir.1980).

#### 2. Actual knowledge requirement applies to physicians.

The actual knowledge requirement has been applied in cases involving the knowledge of physicians. The question was not the application of the knowledge requirement, but the extent of the physician's knowledge. *See Perfetti v. McGhan Medi-*

cal; *Richards v. Upjohn Co.; Hines v. St. Joseph's Hospital.*

#### 3. Ignoring New Mexico decisions.

■ In contending that the actual knowledge requirement should not be applied, plaintiffs ignore the New Mexico decisions. A quick answer to plaintiffs' claim is that this Court must apply New Mexico Supreme Court decisions and approved jury instructions. *Alexander v. Delgado,* 84 N.M. 717, 507 P.2d 778 (1973). Thus, *Garrett v. Nissen Corporation* and UJI Civ. 14.15 dispose of plaintiffs' claim.

#### 4. Merits of plaintiffs' claim.

■ Quite apart from the applicability of Supreme Court precedent, plaintiffs' three arguments for not applying "actual knowledge" are without merit. First, plaintiffs rely on cases involving misdesign or safety devices. Treatment of that type of claim is covered by NMSA 1978, UJI Civ. 14.12 (Repl.Pamp.1980), not UJI Civ. 14.15. These cases do not involve misdesign or safety devices. Second, plaintiffs rely on cases indicating that current technologies, processes and operational methods make it almost impossible to know of the danger. If the actual knowledge requirement is not met, obviously it is not applicable. Actual knowledge is a question of fact. Difficulties in meeting the actual knowledge requirement is a different question than whether the requirement should be applied if there is a sufficient factual basis. Third, plaintiffs argue that there are situations where it is foreseeable that a user of a product will misuse it and there are situations where the manufacturer has misrepresented or actively contributed to a dangerous use. All of these items involve the duty to warn and the adequacy of warnings. *See* A(2) under this issue. These items do not go to the propriety of the actual knowledge requirement.

#### 5. Actual knowledge requirement applies.

In deciding the propriety of the summary judgment on the products liability require-

ment, we apply the actual knowledge requirement.

### C. Whether There is a Factual Issue as to the Actual Knowledge Requirement

#### 1. The meaning of actual knowledge.

We have referred to the actual knowledge requirement, but we have not defined it. These cases involve excessive dosages of radiation; the trial court ruled the radiotherapists fully appreciated the risks and consequences of excessive dosages. The showing is that the radiotherapists knew the risks of excessive dosage—injury to structures in the immediate area of the prostate, rectal injuries that could require colostomies, urethral strictures that could require surgical correction, the development of fistulae. 3M states that these risks were exactly the same as the injuries plaintiffs allege they received. Thus, 3M asserts the actual knowledge requirement was met. We do not agree because this argument goes only to general knowledge of the danger in implanting I–125 seeds.

 We have previously pointed out that knowledge of the danger equates to prior notice; no one needs notice of what he already knows. The duty to warn involves putting one on notice. *See Garrett v. Nissen Corporation.* The adequacy of warnings involves the adequacy of notice given. A warning, to be adequate, must disclose the nature and extent of the danger. NMSA 1978, UJI Civ. 14.18 (Repl.Pamp. 1980). The knowledge that equates to this warning must be knowledge of the nature and extent of the danger. We applied this approach in *Perfetti v. McGhan Medical.* *See Richards v. Upjohn Co.* which refers to the scope of the danger. *Compare Billiar v. Minnesota Mining and Mfg. Co.* which required knowledge that the product could cause *severe* chemical burns. "Actual knowledge" in these cases means knowledge of the nature and extent of the danger of excessive radiation.

#### 2. 3M's argument.

3M recognizes that the propriety of the summary judgment on the products liability claims depends upon there being no factual issue as to the knowledge of the radiotherapists as to the nature and extent of the danger of excessive radiation. It undertakes to demonstrate the absence of a factual issue by showing what the radiotherapists knew. Our approach is to consider what they did not know.

#### 3. Plaintiffs' argument.

Plaintiffs seek to demonstrate what the radiotherapists did not know, but their briefs frequently fail to distinguish between negligence or malpractice and knowledge. For example, plaintiffs cite to evidence going to the inadequacy of the training of the radiotherapists and evidence indicating they were not qualified to implant I–125 into prostates. Neither radiotherapist had implanted I–125 in a prostate under supervision before beginning that treatment in 1977; neither had observed such an implant. We are not concerned with the practice or malpractice of the radiotherapists, in this appeal, except to the extent this bears on their lack of knowledge of the nature and extent of the danger of excessive radiation.

#### 4. Lack of knowledge in the appellate record.

(a) In the "background" portion of this opinion, we pointed out that the radiotherapists did not prescribe limiting doses of radiation to the bladder, rectum or other normal tissues. The tissues adjoining the prostate received radiation in excess of normal tissue tolerance. Dr. Murrell deposed that the tissue tolerance of the rectum is the same as the minimum peripheral dose to the prostate, and that was 30,000 rads. This amount of rads exceeded the desired dose of 16,000 to 24,000 rads. Dr. Murrell has never known the tolerance dose to the bladder with I–125 seeds. He did not know, at his deposition, the tolerance dose to the urethra with I–125 seeds.

(b) The minimum peripheral dose is the dose to any point on the margin of the prostate. The periphery of the prostate is the capsule of the prostate. According to Dr. Murrell, for each implant "seeds were, by design, placed outside the capsule." According to Dr. Murrell, this was acceptable procedure. Seeds placed outside the capsule would be closer to the adjoining tissue—such as the bladder.

(c) In the "background" portion of this opinion, we pointed out that the dosage, either desired or delivered, involves the spacing of the seeds. The radiotherapists spaced the seeds at one centimeter intervals. However, "in order to provide a good peripheral dose, the last seed deposited in any given needle may be half a centimeter from its predecessor." Dr. Murrell had no idea why 3M recommended that seeds be spaced further apart when implanted into the perimeter, and did not know the effect on the minimum peripheral dose of increased seed spacing at the perimeter.

(d) The dosage delivered (the total dose) was part of the radiotherapists' duties and responsibilities. When the implanting of I–125 into prostates was begun in 1977, it was a new technique for the radiotherapists. They knew that the total dose had to be calculated, and that this was done by the dosimetrist, but Dr. Murrell did not know the means by which the dosage was calculated and took no steps to understand what calculations had to be made. The radiotherapists did not know of the manual calculation in determining total dose.

(e) Dr. Simmons agreed he lacked "sufficient insight into implant dose distribution in general to recognize the gross error in peripheral prostate dose that resulted."

(f) When the radiotherapists began implanting I–125 into prostates they knew that "too much" radiation was dangerous. Dr. Simmons had no recollection of literature indicating a maximum total activity for treating cancer of the prostate. Dr. Murrell recalled no warnings in the medical literature about a maximum dosage for I–125 in treating cancer of the prostate, and did not know of an acceptable upper limit.

(g) The radiotherapists did know of literature that recommended a dosage based on dimension averaging and knew that was 3M's recommendation. They followed these recommendations in the earlier implants. Their information after the total dose was calculated was that the delivered dose was too low; the desired dose was 16,000 to 24,000 rads, the dosimetry report did not indicate this was the delivered dose. The radiotherapists were perplexed, they could not explain the low dosimetry figures. The radiotherapists knew of the reported low dosage by the third implant. In an effort to raise the radiation to the desired dose, the radiotherapists departed from dimension averaging, and increased the number of seeds implanted by as much as 20%. The decision to increase the number of seeds was "surely made" in the first half of the cases, and was based on the radiotherapists' experience "in order to compensate for the understated dosage results * * *." Young and Jones were approximately patients twelve and thirteen; seeds were implanted in these patients in an amount larger than the recommended dosage. Simmons and Murrell knew of no guidelines in the medical literature about adding additional seeds in this situation. The decision to increase the number of seeds was based on erroneous dosimetry, and the erroneous dosimetry, in turn, was based on use of the erroneous conversion factor.

5. Factual issue.

█ We have not attempted to identify all of the matters explored in the depositions that go to the knowledge of the radiotherapists. The items set forth in 4 above pertain to their knowledge, and those items disclose a factual issue as to the radiotherapists' knowledge of the nature and extent of the danger of excessive radiation in implanting I–125 seeds in treating cancer of the prostate. There being an evidentiary dispute as to the radiotherapists' knowledge, summary judgment was improper. *Pharmaseal Laboratories, Inc. v. Goffe,* 90 N.M. 753, 568 P.2d 589 (1977); *Billiar v. Minnesota Mining and Mfg. Co.; High*

*Voltage Engineering Corporation v. Pierce,* 359 F.2d 33 (10th Cir.1966); *see Perfetti v. McGhan Medical; Richards v. Upjohn Co.*

6. Caveat.

Inasmuch as we have not reviewed testimony that went to the radiotherapists' knowledge, it is appropriate to remind the reader that we have not decided any factual questions; those must be determined by the fact finder. Our holding is that there is a factual question to be decided as to the nature and extent of the radiotherapists' knowledge. If the radiotherapists are determined to have the requisite knowledge, that is the end of the case. If they lacked the requisite knowledge, then the factual questions of the adequacy of 3M's warnings to the radiotherapists and causation must be determined adverse to 3M before it can be held liable. *Stephen W. Brown Radiology Assoc. v. Gowers,* 157 Ga.App. 770, 278 S.E.2d 653 (1981).

Warranties

The trial court ruled that 3M did not breach any warranty with respect to the I–125 seeds.

A. Express Warranty

■ Both plaintiffs claimed breaches of express warranty. The asserted express warranties were statements contained in 3M's publications. Plaintiffs contend these statements were affirmations of fact. Assuming, but not deciding, these were affirmations of fact, these affirmations do not amount to express warranties unless they were part of the basis of the bargain. NMSA 1978, § 55–2–313(1); NMSA 1978, UJI Civ. 14.28 (Cum.Supp.1983); *Perfetti v. McGhan Medical.*

■ We are not concerned with any bargain between 3M and either Jones or Young. *Perfetti v. McGhan Medical.* The uncontradicted showing is there was no bargain between 3M and the radiotherapists. The hospital did not order the seeds; the radiotherapists did. The hospital did pay for the seeds. There is nothing indicating a bargain between 3M and the hospital. *See*

*Perfetti v. McGhan Medical.* The uncontradicted showing is that use of the seeds came about because urologists in the area were interested in having the seeds used and "pressure" was put on Dr. Simmons to use the seeds. The hospital made no decision as to use of the seeds. This showing, uncontradicted, is sufficient to sustain the summary judgment as to express warranties. *See Perfetti v. McGhan Medical.*

B. Implied Warranty of Fitness for a Particular Purpose

■ Young, but not Jones, claimed a breach of the implied warranty of fitness for a particular purpose. *See* NMSA 1978, UJI Civ. 14.31 (Cum.Supp.1983). This implied warranty requires reliance. UJI Civ. 14.31; *Perfetti v. McGhan Medical.* Young's brief-in-chief asserts "reliance of the most serious and intimate nature was placed on the products." However, Young does not attempt to support this conclusion by reference to material included in the appellate record. The material in the record shows no such reliance, and sustains the summary judgment as to this warranty.

C. Implied Warranty of Merchantability

■ On appeal, both parties claim a breach of the implied warranty of merchantability. *See* NMSA 1978, UJI Civ. 14.30 (Cum.Supp.1983). Neither plaintiff pled a breach of this warranty. This issue, raised for the first time on appeal, will not be considered. NMSA 1978, Civ.App.R. 11; *see St. Vincent Hospital v. Salazar,* 95 N.M. 147, 619 P.2d 823 (1980).

The summary judgment on the products liability claims is reversed. The summary judgment on the express and implied warranty claims is affirmed. Plaintiffs are to recover one-half of their appellate costs.

IT IS SO ORDERED.

DONNELLY, J., concurs.

LOPEZ, J., specially concurs.

LOPEZ, Judge (specially concurring).

I agree with the majority and I join in its opinion regarding the issue of express and implied warranty.

I would also agree with the majority and I would join in its opinion relating to the issue of strict products liability, if I accepted the premise that the record on appeal and the applicable laws could only be reasonably read and interpreted, as the majority would have us do so; but I do not agree with that premise. My reading and interpretation of the record before this court and the applicable legal authorities compel me to specially concur on the issue of strict products liability.

FACTS

Two lawsuits were brought in the District Court of Bernalillo County to recover damages for personal injuries caused by isotopic radiation-emitting (I–125) seeds manufactured by the 3M Company and implanted within the bodies of the male plaintiffs by their physicians for the purpose of treating cancer.

On February 10, 1982 plaintiffs Donald and Virginia Jones filed their complaint in the District Court of Bernalillo County seeking damages for personal injury resulting from the use of I–125 seeds implanted within Mr. Jones' body. In its relevant parts, the complaint alleged that the seeds were "inherently dangerous radioactive materials;" that 3M failed to adequately warn or instruct the physician-users of the I–125 seeds or their patients of the dangers of seed implantation; that as a result of the failure to warn the seeds were a defective and unreasonably dangerous medical product; and that the plaintiffs were injured as a result of the absent or inadequate warning.

In addition to the assertion of a cause of action in strict products liability, plaintiffs alleged breach of express and implied warranties based on both express representations and over-promotion by 3M and on failure of the product to perform as implicitly warranted. The implied warranty claims are founded on positive misrepresentations and false assurances as well as the inadequacy of warnings accompanying the product.

On March 18, 1982 plaintiffs Mr. and Mrs. Arthur L. Young filed their Third Amended Complaint in the District Court of Bernalillo County seeking damages for injuries resulting from the use of 3M's radioactive seeds. In its relevant parts, the complaint alleged that the I–125 seeds were medical products and that 3M had a "duty to warn the users and purchasers of I–125 seeds of the inherent dangers of the seeds, the risks of using the seeds, the potential adverse reactions to using the seeds, and the proper dosage of seeds to use." Plaintiffs sought relief on the grounds of strict products liability, alleging that "[h]ad there been an adequate warning, plaintiff Arthur Young would have received substantially less radiation exposure from I–125 seeds or would never have been given I–125 seeds * * *."

A warranty count similar to that in the *Jones* case was also included in the *Young* case. After setting out several express misrepresentations used by 3M to promote use of its medical product, the complaint alleges breach of both express and implied warranties as well as sale of a defective product.

Both complaints originally stated additional causes of actions against the treating physicians who prescribed and supervised the implantations, the dosimetrist who calculated the dosages, the hospital where implantation was performed, and the developer and programmer of the computer program which resulted in the administration of over-dosages of the radioactive seeds to these plaintiffs. (The plaintiffs' claims against the treating and prescribing physicians and the hospital have been settled; following the grant of summary judgment to 3M which is herein appealed, only the actions against defendants Dennis Leavitt and the University of Utah remain active in the district court.)

On April 7, 1982, 3M filed its motion to dismiss or for summary judgment. Argument on the motion was presented by counsel at a hearing on August 23, 1982.

The record shows that the reasoning behind the trial court's summary judgment is based on the following:

The Court is of the opinion the facts show that the seeds were radioactive, that the treating physicians and entities were fully aware of the radioactive nature of the seeds, and fully appreciated the risks and consequences of excessive dosages of radiation. Therefore, any appropriate warning would have added nothing to the physician's or patient's knowledge in this situation.

It is my interpretation of plaintiff's argument, which I reject, that 3–M, in order to fulfill its duty, would have to make medical determinations and evaluations as to any procedure in which their products were used and, in effect, give warning which would be extensive enough to educate the treating physicians in correct treatment procedures.

In addition, I find no breach of express or implied warranty.

## ADEQUACY OF WARNINGS.

The plaintiffs challenge summary judgment in respect to adequacy of warnings because the trial court decided as a matter of law that there was no duty on the part of 3M. The plaintiffs contend that the issue was a matter of fact. On the other hand, 3M contends summary judgment was correct because the issue was purely a matter of law, and not a matter of fact, and that the trial court properly applied the applicable law to the facts.

I agree with the defendant's contention that when the facts regarding the duty of 3M, in this case the adequacy of warnings in a strict products liability case, are undisputed, the trial court can decide the issue as a matter of law. However, when the facts leading to the duty of the manufacturer to warn are in dispute, the issue becomes a matter of fact. *Moulder v. Brown,* 98 N.M. 71, 644 P.2d 1060 (Ct.App.1982). *See Richards v. Upjohn Co.,* 95 N.M. 675, 625 P.2d 1192 (Ct.App.1980); *Michael v. Warner/Chilcott,* 91 N.M. 651, 579 P.2d 183 (Ct. App.1978). *First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.1975). On review of a summary judgment this appellate court has a duty to view the matters presented in the most favorable aspect that they will bear in support of the right to trial on the issues. *Read v. Western Farm Bur. Mut. Ins. Co.,* 90 N.M. 369, 563 P.2d 1162 (Ct.App.1977).

Our duty is to review all the evidence in the case regarding duty, including the absence or inadequacy of the defendant's warnings. I will summarize the significant disputed facts regarding this issue.

The product in this case is a tiny, but very potent "seed" of invisible radioactive energy incased in a titanium alloy shell. The 3M Company is the only manufacturer of these Iodine–125 seeds; the radioactive seeds have been promoted and marketed by 3M.

The seeds manufactured by the 3M Company are radioactive energy-emitting, encapsulated products sold to physicians and hospitals for implantation in their patients. The I–125 seeds are intended to act on the body tissues to shrink cancerous growths, and are specifically recommended by 3M for permanent implantation within the prostate gland.

Although it is certain that the radioactive nature of the seeds was well-known to both physician-users and patient-recipients, adequate warnings of the proper uses, foreseeable misuse, extent of risks and dangers, contraindications, adverse reactions, and proper dosages have never been provided by 3M to anyone. In fact, 3M failed to provide *any* adequate warnings, leaving physicians and patients to rely on promotional material devoid of warnings.

Since 3M failed to provide warnings, the only information available to some treating physicians from 3M was contained in the brochures and advertising material produced by 3M. This material included representations that the seeds were "safe" and "ideal," and that "[p]atient tolerance of the permanent procedures is very good"; that the implant procedure is "usually quick, seeds are well-tolerated by the implanted

tissue \* \* \*. Consequently, patient discomfort is minimized and complications are considerably less frequent than for other modalities." Many contradictions of these representations appear in the record.

3M's promotional material also included claims that the seeds are simple to apply with "familiar radon-gun techniques." Experts have disagreed. Dr. Kelsey, a radiation physicist and the director of biomedical physics at the University of New Mexico Hospital conducted the first full investigation of the I–125 implantation problems at St. Joseph Hospital. Dr. Kelsey testified:

> Q Do you think that the manufacturer of the I–125 seeds was remiss in not warning physicians about the use of the seeds?
>
> A Yes, sir.

Because of these and other direct assertions of safety, combined with the absence of warnings about negative aspects of the use of the I–125 seeds, the plaintiffs contend that they and their physicians were misled into using the radioactive seeds.

The physicians knew that the seeds were radioactive, but they knew little or nothing about the implications of the use of that kind of radioactivity in the formulation manufactured by 3M. 3M's representations and lack of warning, when 3M knew or had reason to know of the damages to society thereby caused, constituted just the kind of tortious action which normally gives rise to liability. Dr. Murrell's deposition in part stated as follows:

> [I]t was unwise to implant him with as much radiation as he was implanted with. At the time, our judgment was that that was an appropriate amount of radiation with which to implant him. . . .

Dr. Simmon's deposition shows that he did not even know how much training was required to be competent in I–125 implant therapy.

Although Dr. Simmons and Dr. Murrell each testified in their own defense that they went to Dr. Syed to learn how to do the I–125 implants, Dr. Syed, an expert in the field, testified that the doctors did not even view any I–125 prostate implants when they visited him. Dr. Syed testified that he never would have advised Dr. Simmons and Dr. Murrell to proceed with I–125 implants. Dr. Syed's deposition shows that the doctors had not had the preferred training in the physics or the proper technique of using I–125.

Even Dr. Lowell Anderson, author of the "Anderson Nomogram," testified that Dr. Simmons and Dr. Murrell were not qualified to perform I–125 implants. Dr. Murrell, in fact, testified that he had not ever read *any* warnings about maximum dosages of radiation for I–125 seed therapy; and he had never seen an I–125 implant of the prostate before beginning the program at St. Joseph Hospital.

Unfortunately, the unprepared and ill-trained physicians then read the inadequate information distributed by 3M and its predecessor. They used this material to "gain knowledge." Dr. Simmons thought that the manufacturer had the responsibility of providing information about the I–125 seeds, but he was unable to state either how much he considered necessary or how much he had received.

Both physicians testified about inadequacies in the information received from 3M. 3M never provided any information about adverse reactions or contraindications to the use of the seeds. 3M generally misstated facts about the seeds' alleged "lack of morbidity" and the claim that complications were "considerably less frequent" with I–125 seed implants than for other modalities of treatment. Dr. Murrell stated that the brochure does not describe what can be expected when the seeds are implanted into a prostate gland. The 3M brochure did not set limits on the number of seeds or dosages that the doctors were to use. In fact, 3M's brochure was so inadequate that it never even mentioned the risk of overdosage. 3M never warned the doctors not to implant more seeds than called for by the dimension averaging method. The brochure contained exaggerations and was not a balanced presentation.

**280**

With inadequately trained physicians and an inadequate warning, it is very likely that the physicians did not know the risks involved in using I–125 seeds. Both Dr. Simmons and Dr. Murrell thought it was safe to depart from the dimension averaging methods described in the 3M brochure by increasing the number of seeds. Dr. Simmons did not know whether the risks of rectal injury and urethral fistula, the injuries suffered by Mr. Jones and Mr. Young, were related to the amount of millicuries of I-125 implanted. Dr. Murrell thought that dosimetry showing volumes receiving 75,000 rads of radiation was appropriate, but the national expert, Dr. Lowell Anderson, stated that Memorial Sloan-Kettering had not generated doses of that magnitude.

The trial court adopted 3M's position that the doctors knew the seeds were radioactive and that was all the warning needed. From looking through the deposition excerpts which have been cited it should be clear that the issues have been oversimplified by the trial court. I–125 seeds were advertised as being unique and safe. The 3M Company convinced Dr. Simmons that the I–125 seeds were safer than other types of radiation, and the doctors thought it was safe to give more radiation than called for by the dimension averaging method.

I believe that I have summarized all the evidence and I conclude that the facts are in dispute as to the doctor's knowledge and appreciation of the risk they were taking with I–125 implants.

I will now review some of the New Mexico cases and cases from other jurisdictions, which are applicable to the case at bar to help decide this case.

Summary judgment is proper only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. NMSA 1978, Civ.P.R. 56 (Repl.Pamp.1980); *Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972). Summary judgment is a drastic remedy to be used with great caution. *Pharmaseal Laboratories, Inc. v. Goffe,* 90 N.M. 753, 568 P.2d 589 (1977). The party opposing the motion for summary judgment is to be giv-en the benefit of all reasonable doubts in determining whether a genuine issue of fact exists. *Goodman v. Brock, supra.* All reasonable inferences must be construed in favor of the party opposing judgment. *Smith v. Klebanoff,* 84 N.M. 50, 499 P.2d 368 (Ct.App.1972).

In *Richards v. Upjohn Co.,* the court stated:

1. *Summary Judgment.*

Summary judgment is proper only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. N.M.R.Civ.P. 56(c), N.M.S.A. 1978. Upjohn contends that as a matter of law its drug is not the cause of Plaintiff's deafness. In essence, it argues: 1) Richards offered no medical testimony that neomycin sulfate caused his deafness and so failed to establish that absorption of the drug was the actual cause of the deafness; 2) even if the drug caused the injury, no evidence was presented that the warnings contained in the PDR's and package inserts were inadequate; and 3) even if the warnings were inadequate, Dr. Weaver's decision to use the drug in an irrigation solution without first consulting the PDR was an independent intervening cause relieving Upjohn of liability.

\* \* \* \* \* \*

A drug manufacturer has a duty to warn the medical profession of the dangers of its drugs which it knew or should have known to exist. *Baker v. St. Agnes Hospital,* [1978–1979 Transfer Binder] Prod. Liab.Rep. (CCH) ¶ 8563 (N.Y.App.Div. Oct. 29, 1979); *Tinnerholm v. Parke Davis & Co.,* 285 F.Supp. 432 (S.D.N.Y.1968); *see generally,* 72 C.J.S.Supp. Products Liability § 26(a) (1975). The manufacturer is liable to a patient who suffers injuries from a drug as a result of the manufacturer's breach of its duty to warn the doctor of the dangers of the drug. *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522 (1974). The breach of the duty by a drug manufacturer to provide adequate warnings renders

the drug unreasonably dangerous, and the drug is then a defective product for purposes of strict products liability. *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.1975). *See,* Restatement (Second) of Torts § 402A, Comment h (1965). Five relevant standards concerning the adequacy of warnings about a dangerous drug are enumerated in *NorAm:* 1. the warning must adequately indicate the scope of the danger; 2. the warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the drug; 3. the physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger; 4. a simple directive warning may be inadequate when it fails to indicate the consequences that might result from failure to follow it and, most importantly, in the context of the present case; 5. the means to convey the warning must be adequate. In other words, the drug manufacturer must bring the warning home to the doctor. *McEwen; see, Baker.* The drug company's duty is to use reasonable care to warn under all the circumstances. *Love v. Wolf,* 226 Cal.App.2d 378, 38 Cal. Rptr. 183 (1964). It must make reasonable efforts to warn. *Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978 (8th Cir.1969). What is reasonable in part depends upon the magnitude of the risk involved. Restatement *supra,* § 388, Comment n.

95 N.M. at 677–79, 625 P.2d 1192.

I believe that the critical issue, considering all the facts and law in this case, is whether the trial court properly decided as a matter of law that 3M is relieved of its obligation to warn the doctors about the dangerous propensity of the product when the radioactive nature of the product is obvious and when the facts are disputed as to whether the doctors using the product knew about the risks they were taking.

Few products are as obviously dangerous as dynamite. *Hopkins v. E.I. Du Pont de Nemours & Co.,* 199 F.2d 930 (3rd Cir.1952), involved the accidental explosion of dynamite sticks placed together in a hole by employees trained in the handling of explosives. The defendant argued that "everybody knows that dynamite is dangerous and that there is no need to warn against the obvious." The court responded:

> But plaintiff's theory does not go the *generally* dangerous character of dynamite.... Everybody knows that dynamite should not be thrown in a fire, but apparently most construction workers do not know that it should not be placed in a hole under the conditions existent in this case.

199 F.2d at 933 (emphasis in original) (footnote omitted).

In a recent New Mexico strict products liability case, *Perfetti v. McGhan Medical,* 99 N.M. 645, 662 P.2d 646 (Ct.App.1983), this Court discussed this precise issue. *Perfetti* concerns a breast implant which deflated. The surgeon had general knowledge of the risk of deflation and the defendant manufacturer tried to escape liability for his failure to warn by pointing to that knowledge. This Court found for the injured plaintiff, ruling that:

> Defendant's claim is based on the surgeon's general knowledge of the danger .... This mistakes the danger involved and, thus, the warning that was required. Defendant's duty was to warn of the nature and extent of the danger.... There was a factual question for the jury as to the surgeon's knowledge of this danger; the trial court could not have properly ruled on the surgeon's knowledge as a matter of law.

662 P.2d at 651.

Another interesting New Mexico case involving a similar issue is *High Voltage Engineering Corporation v. Pierce,* 359 F.2d 33 (10th Cir.1966). The victim of an electron accelerator accident at Sandia Laboratories sued the manufacturer of the accelerator for failing to warn of its propensity to injure him with a radioactive beam. The defendant manufacturer contended that it was under "no duty to warn the appellees of the particular danger because as scientists they knew or should have known of

it." This contention was presented to the jury, which found against the manufacturer. In reviewing the decision, the appellate court restated the applicable law:

[A]s the supplier of a dangerous instrumentality the appellant was under a legal duty to warn prospective users of dangers which it knew or should know, and that such warning should be commensurate with the degree of danger involved, i.e. the warning must be directed to the specific danger and sufficient to cause a reasonable man acting under similar circumstances with the same knowledge and background to know the potential danger involved in the exercise of reasonable care.

359 F.2d at 35. The Court then went on to explain the proper standard for review:

We, of course, judge the critical question of equal knowledge or adequate notice in the context of an instrumentality specially designed for experimental use by highly skilled operators and physicists. * * *

The issue of equal scientific knowledge was well within the realm of fact.

359 F.2d at 35–36.

The physicians' general knowledge of the I–125 seeds' obvious radioactivity offered scant protection to their patients in comparison to the protection which could have been afforded them through the vast knowledge and resources of the defendant manufacturer. If 3M had really done "all it could do", these cancer patients would probably not have been injured. The physicians' knowledge relative to the manufacturer's knowledge in this case should present but one of many issues of fact for the jury rather than an excuse to preclude the litigation.

In *Rudisaile v. Hawk Aviation, Inc.,* 92 N.M. 575, 592 P.2d 175 (1979), a pilot leased a plane which had no oil in the engine. The defendant claimed that the airplane was not defective and that the deceased pilot should have known that the plane had no oil. The New Mexico Supreme Court disagreed with both contentions:

[T]o prove liability under § 402A the plaintiff need only show that the product was dangerous beyond the expectations of the ordinary consumer. The reasonableness of the acts or omissions of the plaintiff is never considered in determining whether a product is "defective." * *

The next issue we address is whether decedent's own conduct should be a defense to strict tort liability * * *. Defendant is seeking to establish conventional contributory negligence as a defense to strict liability. We refuse to accept this argument.

Conventional contributory negligence is not an affirmative defense to strict liability. (Citations omitted.) "[C]ontributory negligence, as a defense to strict liability in tort, should be limited to those cases where the plaintiff *voluntarily and unreasonably encounters a known risk.*" * * (Citations omitted.) The existence of due care on the part of the consumer is irrelevant. (Citations omitted.)

92 N.M. at 577, 592 P.2d at 177. (Emphasis in original).

The general rule of strict products liability is set out in § 402A of the Restatement (Second) of Torts (1965):

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Thus, when there is a causal relationship between the unreasonably dangerous defect

and an injury, the strict liability rule of § 402A relieves the plaintiff from the necessity of showing there was either a lack of ordinary care or negligence by the manufacturer or, as would be required in a traditional warranty case, that a contractual relationship between the parties existed.

In this kind of case, the defect in the product "is not the dangerous propensities or side effects of the drug, but the failure to warn." *Hamilton v. Hardy,* 37 Colo.App. 375, 549 P.2d 1099 (1976).

> Thus the question to be posed to the jury with regard to the strict liability issue is whether the manufacturer's failure to adequately warn rendered the product unreasonably dangerous· without regard to the reasonableness of the failure to warn judged by negligence standards.

*Id.* 549 P.2d at 1108.

> A way to determine the dangerousness of the article, as distinguished from the seller's culpability, is to assume the seller knew of the product's propensity to injure as it did, and then to ask whether, with such knowledge, he would have been [acting unreasonably] in selling it without a warning.

*Phillips v. Kimwood Machine Company,* 269 Or. 485, 525 P.2d 1033, 1039 (1974); *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir. 1974). Applying the *Kimwood* test to 3M's radioactive seeds, a jury question is apparent. If 3M knew that massive overdosages of the seeds would be administered to these victims, could it reasonably market them without any warning?

Products with medical application, such as the radioactive seeds manufactured by the 3M Company, are products within the definition of strict products liability. Many drug and medical products, although not defectively manufactured, may nevertheless be inherently unsafe. Recognizing both the inherent risk and the social necessity for use of such products, Comment k to § 402A of the Restatement (Second) Torts provides that:

> k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are *especially common in the field of drugs * * *. Such a product, properly prepared, and accompanied by proper directions and warning,* is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. * * * The seller of such products, *again with the qualification that they are properly prepared and marketed, and proper warning is given,* where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk. (Emphasis added.)

The rationale behind Comment k was explained in *Borel v. Fibreboard Paper Products Corporation,* 493 F.2d 1076, 1088–89 (5th Cir.1973):

> Strict liability may not always be appropriate in such cases because of the important benefits derived from the use of the product. This is especially so with respect to new drugs that are essential in treating disease but involve a high degree of risk. * * * As a practical matter, the decision to market such a product requires a balancing of the product's utility against its known or foreseeable danger. But, as comment k makes clear, even when such balancing leads to the conclusion that marketing is justified, *the seller still has a responsibility to inform the user or consumer of the risk of harm. The failure to give adequate warnings in these circumstances renders the product unreasonably dangerous.* The rationale for this rule is that the user or consumer is entitled to make his own choice as to whether the product's utility or benefits justify exposing himself to the risk of harm. Thus, a true choice situation arises, and *a duty to warn attaches, whenever a reasonable man would want*

*to be informed of the risk in order to decide whether to expose himself to it.* (Citations omitted) (emphasis added).

Certainly, I–125 seeds, which are intended to be implanted by trained and qualified physicians, fall within the definition of unavoidably unsafe products. Comment k thus provides what could serve either as a door leading to escape from strict liability or a trap door leading to the downfall of the unwary manufacturer. The key to the door which 3M should have taken and which would have prevented the damage suffered by these plaintiffs is in the form of warnings. The assertion of liability in this case hinges on the warning which the manufacturer who wishes to avoid liability for an unavoidably unsafe product must provide and which 3M chose to avoid.

Many courts have considered the distinction between "negligence" and "strict liability" actions based upon an alleged failure to warn. *See, Ortho Pharmaceutical Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541 (1979); *cf.* § 388, Restatement (Second) Torts (1965). By alleging only causes of action in strict products liability and warranty, plaintiffs have spared this Court that effort, although it should be noted that the general consensus is that there is no great difference between the two actions in the context of the "failure to warn" cases. What difference there is concerns the elements of proof which are required: "[I]n strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did." *Phillips v. Kimwood Machine Co., quoting, Roach v. Kononen,* 269 Or. 457, 525 P.2d 125 (1974).

In addition to the question of which standard, negligence or strict liability, is properly applicable, much effort has been expended on the question of whether the manufacturer should be held to strict liability for failure to warn only when he has no actual or constructive knowledge of the danger, or whether the liability is more complete and knowledge should be assumed. *Ortho, supra,* 388 N.E.2d at 546–47. This question need not be addressed here because the trial court has held only that, as a matter of law, and regardless of the knowledge of 3M, there is no duty to warn.

In *Haugen v. Minnesota Mining and Manufacturing Co.,* 15 Wash.App. 379, 550 P.2d 71 (1976), the court considered the manufacturer's duty to warn adequately of the hazards involved in the use of a grinding wheel. The court concluded that the liability of a manufacturer may be established by:

> [S]howing a product is defective, though faultlessly manufactured, if it is unreasonably dangerous when placed in the hands of the ultimate user by a manufacturer *without giving adequate warnings* concerning the manner in which to safely use it.

550 P.2d at 76 (emphasis in original).

By granting summary judgment based on the conclusion that there was no need for the 3M Company to warn anyone of the inherent dangers of the radioactive seeds' use or misuse, the court has skipped over the question of who is entitled to be warned and the reasons for that entitlement. The best authority of law holds that the duty of the manufacturer of prescription drugs is to warn the prescribing physician, but that the manufacturer who fails to adequately warn is liable to the patient.

The requirement that only the physician who prescribes an inherently dangerous drug need be warned (and not his patient), has been explained as follows:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential

dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

*Reyes v. Wyeth Laboratories,* 498 F.2d at 1276 (footnote omitted). Since the physician is the medical expert who stands in an intimate relationship with his patient, he is expected to weigh the risks and benefits of the product against the needs, susceptibilities, and reactions of his patient, and decide on the products used accordingly, *see Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir.1968); *Dalke v. Upjohn Co.,* 555 F.2d 245 (9th Cir.1977).

New Mexico has adopted and applied the doctrine of strict products liability as defined by Restatement § 402A, *Stang v. Hertz Corporation,* 83 N.M. 730, 497 P.2d 732 (1972). In *Hines v. St. Joseph's Hospital,* 86 N.M. 763, 527 P.2d 1075 (Ct.App. 1974) the court said that "blood was a product 'incapable of being made safe for [its] intended and ordinary use' " and thus inherently unsafe.

The New Mexico medical products case, *Richards v. Upjohn Co., supra,* directly addresses some of these same issues of adequacy of warning. In *Richards,* where the manufacturer's warning failed to prevent misuse by physicians, the appellate court reversed the lower court's grant of summary judgment for the defendant drug company. Richards and his wife had sued on theories of breach of warranties, strict products liability and negligent misrepresentation when he suffered permanent hearing loss after use of neomycin sulfate in 1973. This Court held that the adequacy of the warning was an issue of fact to be decided by the jury, precluding summary judgment.

In *Richards, supra,* the Court discussed the specific duty of a manufacturer of an inherently dangerous drug to warn:

The drug company's duty is to use reasonable care to warn under all the circumstances. *Love v. Wolf,* 226 Cal. App.2d 378, 38 Cal.Rptr. 183 (1964). It must make reasonable efforts to warn. *Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978 (8th Cir.1969). What is reasonable in part depends upon the magnitude of the risk involved. Restatement *supra,* § 388, Comment n.

95 N.M. at 679, 625 P.2d 1192.

In these radiation cases it is obvious that the "magnitude of the risk involved" is extremely great. Contrasted against the extremely great magnitude and seriousness of risk involved in use of the radioactive seeds is the absence of warning by the manufacturer.

With regard to the propriety of the grant of summary judgment, the *Richards* Court again anticipates and directly addresses the issue here:

It is improper for a court on summary judgment proceedings to decide that the warnings of a manufacturer of a drug that is dangerous if misused are adequate as a matter of law if evidence of inadequacy is presented. *Nor-Am; see, Michael v. Warner/Chilcott,* 91 N.M. 651, 579 P.2d 183 (Ct.App.), *cert. denied sub nom. Robbins v. Michael,* 91 N.M. 610, 577 P.2d 1256 (1978). The adequacy of the warnings is a question of fact to be determined by a jury. *Nor-Am.*

I note that the defendant challenges the judicial validity of *Richards, supra,* based on *Casias v. Zia Co.,* 94 N.M. 723, 616 P.2d 436 (Ct.App.1980). I do not agree, based on the following grounds. *Richards* was decided in April 1980 and *Casias* in August 1980. *Casias* does not have any retroactive effect. *Richards* was a decision upon which the judges' decision was within NMSA 1978, § 34–5–11 (Repl.Pamp.1981). I would hold that the defendant's statement that *Rich-*

*ards* does not have any judicial applicability to the case at bar is erroneous, inaccurate and it is a pernicious interpretation of *Casias* as it applies to *Richards*. *Richards* is good law.

Finally, considering all the facts in this case, especially those disputed facts which as I have reviewed above, and based on all the legal authorities of New Mexico and other jurisdictions which I have cited, it is my opinion that there is an issue of fact as to the adequacy or failure to warn. There-fore, the judgment in this respect should be reversed.

The judgment of the trial court should be reversed and remanded for proceedings consistent with this opinion.

Appellate costs to be paid by defendant.